Gabrielli, J.
 

 While preparing to secure his position in a tall oak tree prior to trimming its branches, plaintiff, an employee of third-party defendant Floral Park Landscaping' Co., Inc. (FPLC), came into contact with a 7,620 volt uninsulated power line maintained and owned by defendant Long Island Lighting Company (LILCO). As a consequence, he suffered severe burns and fell from the tree, causing him to sustain further serious injuries. Plaintiff Miner and his wife brought this action against LILCO for personal injuries and loss of services because of LILCO’s negligence in positioning the wire and failing to properly insulate or maintain the power line. LILCO, in turn, commenced a third-party action over against Miner’s employer, FPLC.
 

 The jury rendered verdicts in favor of the Miners and against LILCO in the sum of $2,175,000; and judgment was entered thereon.
 
 [1]
 
 A divided Appellate Division reversed the judgment, on the law and the facts, and dismissed the com
 
 *375
 
 plaint apparently on the ground that plaintiffs failed to establish the breach of duty by LILCO which might have been a proximate cause of the accident.
 
 [2]
 

 The principal issues are whether LILCO, in the circumstances described below, owed an obligation to Miner to exercise care to keep its power lines in a reasonably safe condition and, if so, whether, upon the evidence adduced at trial, the jury could properly have concluded that LILCO breached its duty to Miner.
 

 Two days prior to the accident, Samuel Soffer, president of FPLC, gave Miner, then 23 years old, an order to trim a tree at 12 Elm Drive in New Hyde Park, a village located in suburban Nassau County. The tree was approximately 60 feet tall, in close proximity to a private residence and laden with the leaves and foliage of midsummer. Although he instructed Miner as to "what and how much to cut”, it does not appear that Miner knew of the dangers posed by the high-voltage wires which passed through the tree nor did Soffer notify LILCO of its intention to do tree trimming. Evidence at trial showed that Miner had completed but one year of high school and had no electrical training or experience. Although he had worked as only a seasonal tree trimmer for three years and that only on three or four occasions had trimmed trees of up to 20 feet in height, Miner had never received any climbing training and had been utilized principally for cleaning up the debris that was trimmed from the trees by others.
 

 On August 15, 1969, the day of the accident, Miner, and his helper-brother, Robert Paul Miner, arrived at the job site, unloaded their equipment and prepared to trim the tree. Plaintiff testified that prior to climbing the tree he donned the appropriate safety equipment including a safety line which he clipped onto his belt. He stated that he climbed the tree looking up after every step to locate something to which he could cling with his hands. He climbed up past the main fork in the tree, which was approximately 20 feet above ground
 
 *376
 
 level, and out on one of the main limbs of the tree. He then prepared to throw the safety line around the tree to secure himself in order to prevent a fall. That was, he explained at trial, "the last thing I remember”. His brother Robert who had observed Edward during the preparations and climb, corroborated his testimony and also detailed for the record the sound and odor of the electrical shock, and Edward’s subsequent fall from the tree. Other evidence demonstrated, and it is not now disputed, that Miner inadvertently made contact with the primary power line (carrying 7,620 volts) as well as a neutral line, which ran parallel to each other above the fork in the main tree limbs. By simultaneously touching both electrical lines with his safety line, Miner completed a potent electrical circuit that caused the severe shock which burned him and knocked him out of the tree.
 

 The power lines, owned and maintained by LILCO, had been installed in 1941 and had, or so the jury could have found, not been examined or inspected again until after the accident. The primary or high-voltage line was strung within 7 feet of a residence on one side and within 12 feet of a residence on the other, and was at a height of approximately 23 feet. It was covered by a gray material which gave the equivocal appearance of being an insulation covering but in fact served only as weatherproofing.
 

 Alexander Kusko, a professor at the Massachusetts Institute of Technology and an electrical engineering expert, testified that 7,260 volt power lines were used in industrial areas, and that their use in residential areas created a safety hazard. Moreover, it was definitely not, he said, a good safety practice to pass such high voltages through uninsulated wires in residential areas. In addition, he noted that at the time of the accident there was commercially available wire, commonly known as "tree wire”, capable of insulating 7,620 volts. Professor Kusko further testified that sound safety practice required that all distribution circuits including those running through trees be inspected routinely, and the failure to inspect the wire in issue for over 28 years was not a safe practice. On cross-examination, he recognized that the primary power line had been installed within the limits of the National Electric Safety Code and that rule 3 of the Board of Standards and Appeals (12 NYCRR 3.1
 
 et seq.)
 
 set forth good practices.
 

 Another expert called by plaintiff, an electrical engineer
 
 *377
 
 employed by the Grumman Aerospace Corporation, expressed his agreement with Professor Kusko’s testimony and stated that it was his opinion that it was not a good or safe practice for LILCO to run uninsulated high-voltage power lines through a populated, suburban area. He testified that at the Grumman Aerospace facility where he worked, uninsulated high-voltage lines were not strung within 50 feet of any building, and that such spacing was consistent with good electrical safety practices.
 

 Neither LILCO nor FPLC called any electrical engineering experts.
 

 The defense, insofar as it related to the main complaint, was to show that Miner was a sufficiently experienced tree trimmer so as to be conscious and aware of the presence of the wires and the risk they created, and that he disregarded that risk; and also that he was obligated to give LILCO notice that work was to be performed within six feet of a high power line, as required by rule 3 (12 NYCRR 3.6 [c]).
 
 [3]
 
 Relevant thereto, the Trial Judge in his charge read the jury the following pertinent provisions of rule 3 (12 NYCRR 3.2, 3.4):
 

 "Rule 3.2 states as follows: 'It is the purpose and intent of this part (rule) to require reasonable and proper guarding against personal injuries to all persons hired to engage in the cutting, trimming or removal of trees or brush around or near power lines or power facilities.’
 

 "Section 3.4, subdivision I, defines tree trimmer and states as follows: 'A person who trims, cuts and removes trees or brush around or near power lines and power facilities. For the intent of this part (rule) the following experience and qualifications are defined as minimum requirements for grades of tree trimmers.
 

 '1. Apprentice tree trimmer. A tree trimmer at least eighteen years of age, who is in the process of receiving at least one year of apprentice training in trimming, cutting and
 
 *378
 
 removal of trees and brush under the supervision of a job foreman.
 

 '2. Trained tree trimmer. A tree trimmer, at least nineteen years of age, who has received at least one year of apprentice training in trimming, cutting and removal of trees and brush under the supervision of and satisfactory to a foreman.
 

 '3. Job foreman. A tree trimmer, at least twenty-one years of age, who has at least two years experience as a trained tree trimmer in cutting, trimming and removing trees and brush’
 

 and then charged that:
 

 "it shall be for you to determine whether the plaintiff was a tree trimmer within the definition of that term as set forth in the rules and dependent upon such determination whether the duties devolving upon a tree trimmer under the rules shall apply to the plaintiff.”
 

 Later in the charge and regarding contributory negligence he added that:
 

 "Now, the plaintiff has testified that he had no knowledge of the existence of Rule 3 of the Board of Standards and Appeals. Nevertheless, that does not make the rule any less binding upon him, provided that you shall find from his background and experience that he was a tree trimmer within the meaning of the term as defined in section 3.4, subdivision I, of the rules.
 

 "Now, if, after considering the background and experience of the plaintiff husband in the tree-trimming business, you shall determine that he was a tree trimmer within the meaning of the term tree trimmer as defined in the rules, then a violation of that provision would constitute some evidence of negligence on his part.
 

 "On the other hand, if, after considering his background and experience, you shall determine that he does not come within the definition of the term tree trimmer as stated in the rules, then he may not be considered as having violated Rule 3.6, subdivision A, and no evidence of negligence may be found on his part.”
 

 There should be a reversal and a new trial ordered.
 

 The affirmative duty of power companies to exercise reasonable care in the operation and maintenance of their power lines is clear. The guiding principles were set forth in une
 
 *379
 
 quivocal terms over 60 years ago in
 
 Braun v Buffalo Gen. Elec. Co.
 
 (200 NY 484, 490, 492) where we wrote:
 

 "While the convenience of electric and telephone wires is obvious and their maintenance should not be burdened with excessive liabilities, still it seems clear that a company maintaining dangerous wires should not be relieved on the ground of expense from the affirmative duty of exercising a reasonable degree of care to maintain proper insulation and thereby prevent accidents reasonably to be apprehended to those lawfully coming in the neighborhood of such wires.
 

 * * *
 

 "The fundamental and general principle that a company like respondent, if reasonably chargeable with knowledge, or in the exercise of reasonable prudence bound to anticipate, that people may lawfully come in close proximity to its wires either for purposes of business or pleasure, is under obligation to exercise care to keep the latter in a safe condition is abundantly established.
 
 (Connell v. Keokuk El. Ry. & P. Co.,
 
 131 Iowa, 622;
 
 Rowe v. Taylorville El. Co.,
 
 213 Ill. 318, 322;
 
 Fitzgerald v. Edison El. Ill. Co.,
 
 200 Penn. St. 540;
 
 Wabash, St. L. & P. Ry. Co. v. Locke,
 
 112 Ind. 404;
 
 McLaughlin v. Louisville El. L. Co.,
 
 100 Ky. 173.)”
 

 As was noted by the dissenter below, "The question in each case is the character of the circumstances which require the exercise of those precautions”. One very significant circumstance is the voltage charge; there is, to be sure, a correspondingly higher duty of care owed as higher voltages are transported (compare
 
 Ferrari v New York Cent. R. R. Co.,
 
 224 App Div 182, affd 250 NY 527 [4,000 volts];
 
 Burrows v Livingston-Niagara Power Co.,
 
 217 App Div 206, affd 244 NY 548 [11,000 volts];
 
 Braun, supra
 
 [2,000-3,000 volts];
 
 Caruso v Troy Gas Co.,
 
 153 App Div 431, affd 209 NY 510 [2,300 volts]; with
 
 Van Leet v Kilmer,
 
 252 NY 454 [110 volts]). Another circumstance, equally significant, is the proximity and accessibility of power lines to the public where the opportunity and likelihood of contact therewith is more acute (see
 
 Burrows, supra,
 
 at p 208;
 
 Braun, supra,
 
 at pp 490-491). Here, where high-voltage lines were strung between closely spaced private residences, the risk to be foreseen was of the highest order; thus, the corresponding duty devolving upon the power company must be considered equally great.
 

 Upon the evidence adduced at trial, it is manifest that the
 
 *380
 
 jury could have found that LILCO did not discharge its burden. Testimony showed that it was a good and safe practice to place high-voltage power lines no less than 50 feet from industrial buildings, yet the energized lines were within 7 to 12 feet of private homes where not only tree trimmers, such as Miner, might be foreseen to come in contact with them but also roofers, house painters, do-it-yourself homeowners, children flying kites and, perhaps, others. Uncontradicted expert evidence established that certain wire coverings were readily available in commercial markets that could insulate the high-voltage power lines. Nevertheless, the lines were protected only from the weather, not humans. It was also shown that neither the condition nor location of the lines had been inspected or examined in almost 30 years, thereby leaving a lethal instrumentality in an area where it could, and of course did, cause enormous harm (cf.
 
 Palsgraf v Long Is. R. R. Co.,
 
 248 NY 339). We conclude, therefore, especially in view of the increased duty of care owed under the circumstances obtaining here, that the jury could properly have found that LILCO breached a duty of care owed to Miner, which in this instance was to be measured by the common-law standard of due care.
 

 LILCO also argues, however, that the failure to comply with the rules of the Board of Standards and Appeals (12 NYCRR 3.1
 
 et seq.)
 
 precluded any claim plaintiff may have had. We cannot agree. The trial court charged the jury, and properly we think, that it was for them to determine whether or not Miner was a tree trimmer within the meaning of that term as set forth in the rules of the board. The evidence was, at the very least, susceptible of the conclusion that Miner had never received the rule 3 requisite one year apprentice training and was thus not a tree trimmer within the meaning of the rule. By its verdict, the jury made it clear that it resolved the factual issue conclusively in favor of Miner. In short, however applicable the rule may be upon the proper apportionment of liability between LILCO and FPLC, it is not, in this instance, controlling of the liability of LILCO to plaintiff.
 

 Finally, LILCO argues that the evidence shows it complied with the provisions of the National Electric Safety Code and in some ways exceeded its requirements and, thus, did all that it need have done in the circumstances. However, the code itself expressly provides that its provisions are "minimum requirements” and that "frequently” circumstances require "higher factors of safety than the minimum requirements of
 
 *381
 
 these rules”, circumstances which are certainly present here. Moreover, compliance with customary or industry practices is not dispositive of due care but constitutes only some evidence thereof
 
 (Shannahan v Empire Eng. Corp.,
 
 204 NY 543, 550;
 
 Texas & Pacific Ry. Co. v Behymer,
 
 189 US 468 [Holmes, J];
 
 Matter of Hooper,
 
 60 F2d 737 [Hand, J]; see Prosser, Torts, § 33, p 168).
 

 Accordingly, the order of the Appellate Division should be reversed and a new trial granted, with costs to abide the event.
 

 Chief Judge Breitel and Judges Jones, Wachtler and Cooke concur with Judge Gabrielli; Judge Jasen dissents and votes to affirm on the memorandum at the Appellate Division (47 AD2d 842); Judge Fuchsberg taking no part.
 

 Order reversed, etc.
 

 [1]
 

 . Miner died after the trial and his wife, as administratrix of his estate, was substituted for him.
 

 [2]
 

 . The jury also rendered a verdict in favor of LILCO on the third-party complaint against FPLC which the trial court ordered set aside unless FPLC stipulated, without prejudice to its right to appeal, that the degree of fault be fixed at 25%. FPLC did not so stipulate, and both it and LILCO appealed from the order. The Appellate Division reversed the order and dismissed the third-party complaint on the ground that the appeals were rendered academic by its determination in the main action (47 AD2d 842). Appeals as of right taken by LILCO and FPLC were subsequently dismissed (see 37 NY2d 920 and 37 NY2d 775).
 

 [3]
 

 . 12 NYCRR 3.6 (c) provides: "(c) For all jobs where it is necessary for any work to be performed which would require a person to approach nearer than six feet to a power line or power facility energized at a potential of over 300 volts to ground, the owner of the power line or power facility shall be notified in writing. In not more than one normal working day following the receipt of such written notice, the owner of the power line or power facility shall determine the procedure to be followed in order to perform the work in a safe manner. No work shall be performed until the owner of the power line or power facility has made such determination, except in an emergency situation involving the saving of a human life.”