Kenneth R. LANE, II and Donna L. Lane, Plaintiffs–Appellants,

v.

NEW YORK STATE ELECTRIC & GAS CORPORATION; Kevin M. Hammond and Donna M. Hammond, Defendants–Appellees.

No. 670, Docket 93–7653.

United States Court of Appeals, Second Circuit.

Argued Dec. 6, 1993.

Decided March 7, 1994.

Frederick J. DeFilippo, Elmira, NY (DeFilippo Brothers, of counsel), for plaintiffs-appellants.

Edward B. Hoffman, Elmira, NY (Donna M. Hutchison, Sayles, Evans, Brayton, Palmer & Tifft, of counsel), for defendant-appellee New York State Elec. & Gas Corp.

Michael E. Davis, Pittsford, NY (Michael G. Donnelly, of counsel), for defendants-appellees Kevin M. Hammond and Donna M. Hammond.

Before: OAKES, KEARSE and CARDAMONE, Circuit Judges.

OAKES, Senior Circuit Judge:

Appellants Kenneth R. Lane ("Lane") and Donna L. Lane commenced this diversity action to recover for injuries sustained by Lane as a result of his electrocution by high-voltage electrical power distribution lines owned, operated, and maintained by defendant-appellee New York State Electric & Gas Corporation ("NYSEG"). The accident occurred while Lane was climbing a 125–year old, rotting, hollow, red maple tree on North Street in the Village of Chemung, New York, on or adjacent to property owned by defendants Kevin M. Hammond and Donna M. Hammond ("the Hammonds"). The United States District Court for the Western District of New York, David G. Larimer, *Judge,* granted NYSEG's and the Hammonds' motions for summary judgment and dismissed the complaint. We vacate and remand for trial as to NYSEG and affirm as to the Hammonds.

## BACKGROUND

For over a century, a red maple stood on the north side of North Street, a short distance from the intersection of North and Main Streets in the village of Chemung, New York. The tree was located six to seven feet in a north-westerly direction from a utility pole. The tree's location was in direct conflict with the passage of the utility line. It was evident that the utility company had removed some of the tree stems that were in the path of the utility line and had also pruned limbs on the lateral stem facing west where they faced the utility line.

The trunk of the tree originally went up approximately 16 feet and then forked into two stems which were lateral or side stems. The original lateral stem facing the east or North Street side had been removed or had fallen at least 10 years before the accident. Four shoots had sprouted at the point of removal and were approximately four to six inches in diameter, and these were cut by Lane just before his accident. The westerly-facing lateral stem appeared intact but showed scars from limbs of various sizes that had been removed either mechanically or naturally, most of these scars appearing on the side of the lateral facing the utility pole. This lateral went up approximately 18 feet and then forked again. The northerly fork was gone except for a piece of branch approximately 18 inches in length, appearing to have been removed within the last three years. By the appearance of the scar, it looked as though the fork had ripped from the stem. The remaining stub was ripped lengthwise, exposing a cross-section of the branch, which in turn exposed cross-section showed extensive heart rot in that branch. The trunk of the tree, before the first fork, also showed several old scars, one on the south side of the tree being a hollow cavity approximately eight inches in diameter, and at the first fork or crotch of the tree there was another cavity.

Independent professional forestry consultants indicated that the almost totally-rotted condition made the tree a threat to the power lines, the roads nearby, and anyone near the area. Apparently, red maple is always suspect to heart rot when it is larger than 20 inches in diameter, measured at the stump. Indeed, the interior of the stump was hollow a total of 29 inches of the total 39-inch diameter, or 74 percent thereof. The consulting foresters agreed that the tree had been hollow for a minimum of 25 years and had heart rot for at least 50 years. They further agreed that the tree showed a loss of 45 percent of its strength and had been in a hazardous condition for at least 25 years. They both concluded that the tree should have been removed years before.

On August 20, 1990, Lane, who had some previous experience as a tree climber and trimmer in the late 1970s, was injured as he climbed the old red maple some 30 to 35 feet from the ground. Disputed facts, which we must assume in Lane's favor, include whether he was indeed instructed to take down the tree by Kevin Hammond, who with his spouse owned the adjacent vacant lot on which they were about to build a house, and whether Hammond expressed concern for the safety of his family in the event that the tree fell. Given the condition of the tree, both of these are plausible assumptions. At any rate, taking the evidence in the light most favorable to Lane, he was to cut the maple tree down and use it for firewood. Lane was assisted by two brothers whom he had hired to assist in the tree removal. Lane's first step was to climb the tree in order to attach a rope to it so that as it was cut it would fall away from the power line. It is not disputed that Lane saw the power line before climbing the tree—indeed, the presence of the power line itself motivated Lane to climb the tree.

The line was a 12,500–volt, three-phase line, which is to say there were three live lines on the cross-piece and one "neutral" or grounded line below, with each live wire producing 7,200 volts to ground. The live lines were poly-covered but uninsulated. Below the electric lines, a telephone line and a cable television line were also strung.

Lane first removed the shoots or branches beneath the wires, then donned climbing jack spikes and a climbing belt and began to ascend the tree on the side of it away from North Street. He went up the trunk and then up the remaining lateral stem until he reached the fork. His purpose was to tie a rope to the tree above the live wires. At the fork, with his left hand on the side of the tree near the wires, he either contacted or came within arcing distance of the uninsulated surface of the third wire. A high voltage arc entered his left arm and hand and exited through his right arm and hand which were at the time of contact wrapped around the tree. He fell to the main tree trunk, hanging there until rescuers removed him from the tree and took him to the hospital for treatment including amputative and reconstructive surgery.

There is evidence before us of the statements of a professional product safety consultant with federal certification as an OSHA compliance instructor who has investigated more than 50 power line contact accidents, including several that have involved tree trimming. This expert stated that in his opinion Lane's accident was not unusual. Overall, the expert stated, about six persons per week are fatally injured and about three times that number suffer disabling injuries in power line contact accidents. According to a 1985 report of the Federal National Institute of Occupational Safety and Health, hundreds of Americans are killed each year and thousands injured from such accidents. In the expert's estimation, there are several factors contributing to the type of accident including the tree climber's anatomical configuration; task concentration; failure to judge accurately the distance to the lines; and failure to appreciate the fact that tree limbs can be, especially when moist, good conductors of electricity.[1] It was the expert's opinion that the utility failed in its general safety duty to inspect regularly the lines and observe situations presenting a public safety hazard. The expert also expressed the view that NYSEG failed to trim and remove this tree according to recommended guidelines in general utility practice. The expert continued to state that Lane likely had difficulty in assessing the location of the lines vis-a-vis the tree trunk and limbs and that, had the tree been properly trimmed, the accident would not have happened since the separation distance established by such trimming would have permitted Lane to work without coming within such close proximity to the live wire, just a few inches from the tree. Indeed, in the expert's view, the power company should have removed the tree in accordance with industry standards. According to another expert, the National Electric Safety Code ("NESC"), Section 23, specifies "horizontal clearances from objects with a minimum clearance of three feet," although we do not know whether trees are "objects" within that Code. In addition, Section 20 of the NESC specifies that "trees that may interfere with

supply conductors should be trimmed or removed," or suitably protected from "damage by abrasion and grounding of the circuit through the tree." Moreover—and this is significant—based on the utility's installation of three automatic splices in the vicinity of the tree in recent years, it appears that NYSEG had actual knowledge of the proximity of the tree stem and the rotted condition of the tree. Thus, NYSEG failed to cut and remove the rotted maple despite the fact that falling branches had evidently caused the power lines to be severed at some point in time.

## THE DECISION OF THE DISTRICT COURT

The district court discussed the Hammonds' motion for summary judgment first and considered the question of common law negligence, *Basso v. Miller*, 40 N.Y.2d 233, 240–41, 386 N.Y.S.2d 564, 352 N.E.2d 868 (1976) (landowner must act as a reasonable man in maintaining his property in a reasonably safe condition). We think the court correctly held that whether or not the Hammonds owned the tree, which is in doubt, does not affect the outcome of the litigation under the applicable substantive law, *see generally Cartier v. Lussier*, 955 F.2d 841, 845 (2d Cir.1992) (summary judgment is not precluded where disputed facts are not relevant to a dispositive issue), but incorrectly granted summary judgment on the alternative ground that Lane's conduct was the sole proximate cause of his injuries. The district court held that Lane knew the existence of the power lines before he climbed the tree, that he had been trained on the precautions to take while trimming a tree near high-voltage lines, and that he knew that he had to stay away from the power lines or risk injury from the electricity; in short, that his conduct and carelessness was the sole proximate cause of his injuries.

The court also considered N.Y.Lab.Law §§ 200, 202–h, 240, and 241 (1986 & Supp.) in connection with the liability of the Hammonds. Section 200(1) was said to be merely

---

**1.** In this connection, it is to be noted that at the time of the accident the weather was cloudy and

moist, with local barometric pressure at 29.105.

a codification of the common law duty of the landowner to provide workers with a reasonably safe place to work. *Lombardi v. Stout*, 80 N.Y.2d 290, 294, 590 N.Y.S.2d 55, 604 N.E.2d 117 (1992). However, the court said that because the Hammonds did not control Lane's activities with respect to the removal of the tree, they could not be liable under N.Y.Lab.Law § 200. *Karaktin v. Gordon Hillside Corp.*, 143 A.D.2d 637, 532 N.Y.S.2d 891, 893 (2d Dept.1988).

In addition, the court granted summary judgment for the Hammonds on Lane's claims under N.Y.Lab.Law § 202–h (Supp. 1994). That section, the so-called "High Voltage Proximity Act," which became effective in 1989, requires an employer or "self-employed individual, independent contractor . . . or homeowner" not to participate in the operation of any equipment within dangerous proximity (10 feet) of a high-voltage line unless precautionary action is taken to de-energize the line, and that "the employer, contractor, or other person responsible for the activity" shall notify the power company of such intended activity at least five working days before the activity is to be performed. The court held from the undisputed facts that the Hammonds did not control or direct Lane's work. The court held that in its view the obligation of notification, if any, rested with Lane and no one else, and the regulations under the statute, adopted only after Lane's accident, make it clear that Lane, the person actively engaged in the dangerous activity, had the responsibility for notifying the power company. *See also* 12 N.Y.C.R.R. § 57.7.

The court also rejected Lane's claims under N.Y.Lab.Law §§ 240 and 241, noting that these sections explicitly exempt "owners of one- and two-family dwellings who contract for but do not direct or control the work."

As to NYSEG's motion for summary judgment, the district court agreed that utility companies have an "affirmative duty to exercise reasonable care in the operation and maintenance of power lines," *Capital Mutual Ins. Co. v. Niagara Mohawk Power Corp.*, 137 A.D.2d 877, 524 N.Y.S.2d 561 (3d Dept.) (citing *Miner v. Long Island Lighting Co.*, 40 N.Y.2d 372, 386 N.Y.S.2d 842, 846, 353 N.E.2d 805, 809 (1976)), *appeal denied*, 71 N.Y.2d 806, 530 N.Y.S.2d 109, 525 N.E.2d 754 (1988). The court then went on to say that there was no duty owing to Lane, citing *Sherman v. Robinson*, 80 N.Y.2d 483, 591 N.Y.S.2d 974, 977, 606 N.E.2d 1365, 1368 (1992), and *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928). The court found that "no evidence has been introduced by the plaintiffs to show that this tree interfered with the operation and maintenance of this line," evidently overlooking the splices adjacent to the tree. Moreover, the court held that the affirmative duty to exercise reasonable care in maintaining and operating the power lines does not extend to a tree climber, hired to remove a tree, aware of the hazards involved in taking the tree down and trained in the precautions incident to such hazards. Furthermore, the court held that even if there were such a duty, Lane's carelessness was the sole proximate cause of his injuries.

## DISCUSSION

■ Because the district court dismissed the action on motions for summary judgment, we review its decision de novo. *See Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991). To grant those motions, the district court had to find that the moving parties had carried the burden of establishing that there is no genuine issue of material fact and that they were entitled to judgment as a matter of law. *See Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir.1991); *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988). On appeal, we apply the same standard as the district court and resolve all ambiguities and inferences to be drawn from the facts in favor of the party opposing the motion and resolve all doubts against the moving party. *See Rattner*, 930 F.2d at 209.

■ We first discuss the liability of NY-SEG. According to the experts' affidavits and as reinforced by the photographs, NY-SEG was maintaining and operating uninsulated high-voltage distribution lines in improperly-close proximity to a rotted, dying, old tree which had previously caused damage

to the power lines and which had been trimmed by the power company without being taken down, though it had existed in a rotted, dangerous condition for some 25 years. The tree was a dangerous one and it would appear so to anyone looking at the photographs.

In assessing the liability of NYSEG, we find *Miner v. Long Island Lighting Co.* highly illuminating. *Miner* involved a tree trimmer who was injured when coming into contact with a 7,620 uninsulated voltage wire passing through a tree in close proximity to a private residence. That case went to the jury on the basis of evidence that it was not good safety practice to pass such high voltage through uninsulated wires in residential areas. There was also evidence in the *Miner* case that the failure to inspect the wire in issue for over 28 years was not a safe practice. The court held that the affirmative duty of power companies to exercise reasonable care in the operation and maintenance of their power lines stemmed from *Braun v. Buffalo Gen. Elec. Co.*, 200 N.Y. 484, 490–92, 94 N.E. 206 (1911). Circumstances determining the nature of this duty include the voltage charge, there being a "higher duty of care owed as higher voltages are transported," and "the proximity and accessibility of power lines to the public where the opportunity and likelihood of contact is therefore more acute." *Miner*, 40 N.Y.2d at 379, 386 N.Y.S.2d at 846, 353 N.E.2d at 809. While that case involved high-voltage lines strung between closely-spaced private residences, the court indicated that the duty ran not only to tree trimmers but also to roofers, house painters, do-it-yourself homeowners, children flying kites, and perhaps others. *Miner*, 40 N.Y.2d at 380, 386 N.Y.S.2d at 847, 353 N.E.2d at 810. The court also relied on uncontradicted expert evidence in establishing that certain wire coverings were readily available in commercial markets that could insulate the high-voltage lines, and the fact that neither the condition nor location of the lines had been inspected or examined in almost 30 years, "thereby leaving a lethal instrumentality in an area where it could, and of course did, cause enormous harm (*cf. Pals-*

*graf v. Long Island R.R. Co.*)." *Id.* We take it that the *cf.* cite to *Palsgraf* meant that the Court of Appeals meant to distinguish *Palsgraf*. *See also Holtz v. Niagara Mohawk Power Corp.*, 147 A.D.2d 857, 538 N.Y.S.2d 80, 82 (3d Dept.1989) (quoting *Miner* and saying that "a significant circumstance in determining duty is 'the proximity and accessibility of power lines to the public where the opportunity and likelihood of contact therewith is more acute'" in finding that "it could be found foreseeable that someone making repairs to the home would use a ladder in the vicinity of the wire"); *Capital Mutual*, 524 N.Y.S.2d at 561–62 (stating that "[i]t is well established that utility companies have an affirmative duty to exercise reasonable care in the operation and maintenance of power lines" in holding the utility liable for a fire resulting from short circuit within a distribution box owned and controlled by plaintiff's insured where there was no fuse installed on the customer's incoming service line); *Sundt v. New York State Elec. & Gas Corp.*, 103 A.D.2d 1014, 478 N.Y.S.2d 417 (4th Dept. 1984) (tree trimmer injured when electricity arced from a high-tension wire to a pine tree five to seven feet away from the wire; trimmer's knowledge of existence of high-tension wire did not render him contributorily negligent).

In this case, the tree was immediately adjacent to, if not on, the Hammonds' corner lot at 5319 North Street where that street intersected with Main Street.[2] According to undisputed accounts in Lane's brief, North Street is mostly residential with homes lining both sides of the street, there being a Baptist Church and parsonage directly across from the Hammond property, a post office on Main Street just easterly of the Main Street–North Street intersection, a fire station nearby, a Methodist Church also nearby, and an elementary school with 150 students whose school buses travel along North Street and through the North Street–Main Street intersection on a daily basis during the school year. Thus, while Chemung may be a small

---

**2.** Main Street is also known as County Route 60 and had been renumbered as Route 17C. It

appears on the map of Chemung which is in the Exhibit Appendix at page 387.

town, or even a hamlet,[3] it is by no means open, rural country. Given the degree of voltage, we think it is a jury question whether NYSEG violated its duty and, if so, whether that violation was a proximate cause of Lane's injuries.

■ The district judge's alternative ground for granting summary judgment to NYSEG, stated in one sentence, was, "Furthermore, even if there were such a duty, Lane's carelessness was the sole proximate cause of his injuries." We do not think this is necessarily true, in light of the opinions of the forestry experts, the professional product safety consultant, and the electrical engineer—opinions to the effect that the tree had severed the power lines in the past and was rotted and in danger of falling, and dangerously close to the energized power line. We think the questions both as to whether Lane was careless and whether and to what degree his carelessness contributed to his injury are questions for the jury. We think it cannot be said, as a matter of law, that Lane was careless. Still less can we conclude that Lane's carelessness was the sole proximate cause of his injury. *See Seaman v. A.B. Chance Co.,* 197 A.D.2d 612, 602 N.Y.S.2d 693, 694 (2d Dept.1993) (where decedent was electrocuted by power line running through tree that town had slated for removal, "it cannot be said as a matter of law that [the manner in which work was performed by the decedent] was the sole proximate cause").

■ We deal next with the High–Voltage Proximity Act of the N.Y.Lab.Law, § 202–h, as it bears on whether Lane was solely responsible for his injuries. While we think that it is entirely possible that a jury might attribute fault to a tree trimmer who did not comply with that act by not notifying the power company of his intended activity, and while non-compliance with the act may be evidence of negligence, we do not think that

it is conclusive in this case. Lane and his assistants, after all, were from a nearby town in Pennsylvania.[4] The High–Voltage Proximity Act had been in effect only commencing in 1989, and we assume that neither it nor its regulations—which were not even adopted until September, 1992, over two years after Lane's accident—were sufficiently well-publicized as to alert infrequent tree trimmers or the general public to its requirements.

Judge Joseph McLaughlin, wearing another hat, has called the New York comparative negligence statute, N.Y.Civ.Prac.L. & R. 1411, whereby the amount of damages is diminished in the proportion to which the culpable conduct attributable to the claimant or decedent bears to the culpable conduct that caused the damages, a "pure comparative negligence" statute. *See* Joseph M. McLaughlin, Practice Commentaries, 7B McKinney's Cons.Laws of New York, CPLR C1411.1, at 386 (1980); *see also,* Joseph M. McLaughlin, Supplementary Practice Commentaries, 7B McKinney's Cons.Laws of New York, CPLR C1411.1, at 180 (1994). Thus, if Lane were found by the jury to be 80 percent responsible, he would not be barred from recovery but would recover 20 percent of his damages. *See Rakich v. Lawes,* 186 A.D.2d 932, 589 N.Y.S.2d 617, 619 (3d Dept.1992) (upholding jury's apportionment of liability 80 percent to plaintiff and 20 percent to defendant as supported by weight of the evidence but remanding for new trial on damages unless parties stipulated to $100,000.00 in damages with 20 percent or $20,000 awarded to plaintiff); *see also Lomonte v. A & P Food Stores,* 107 Misc.2d 88, 438 N.Y.S.2d 54 (N.Y.App.Term 1981) (citing McLaughlin commentary with approval in upholding award to plaintiff where jury found plaintiff 75 percent at fault for entering into an altercation with store employee). We note further that the burden of proof of

---

**3.** The population of Chemung, according to the 1990 census, was 2,540.

**4.** Although New Jersey has such a statute and although the New York statute may have been copied from the New Jersey statute, *see Gallas v.*

*Pub. Serv. Elec. & Gas Co.,* 106 N.J.Super. 527, 256 A.2d 289 (1969), *aff'd in part and rev'd in part,* 56 N.J. 101, 265 A.2d 377 (1970), there is no evidence or any indication that Pennsylvania has such a statute.

Lane's culpable conduct is on NYSEG. *See Leiner v. First Wythe Ave. Service Station, Inc.*, 121 Misc.2d 559, 468 N.Y.S.2d 302 (N.Y.City Civ.Ct.1983), *aff'd*, 127 Misc.2d 794, 492 N.Y.S.2d 708 (N.Y.App. Term 1985).

## THE LIABILITY OF THE HAMMONDS

■ We agree with the district court that there was no duty on the part of the Hammonds in view of the fact that they were not exercising control over Lane, an independent contractor who was engaged in the tree trimming conduct. Accordingly, we also agree that N.Y.Lab.Law § 200(1) is inapplicable under *Karaktin, supra*. We also reject Lane's claim that the Hammonds owed him a duty under the New York High Voltage Proximity Act, because that act creates no private right of action. *See Gain v. Eastern Reinforcing Serv., Inc.*, 193 A.D.2d 255, 257, 603 N.Y.S.2d 189, 191 (3d Dept.1993). Under N.Y.Lab.Law §§ 240 and 241, the exemptions for owners of one- and two-family dwellings are applicable because, while the Hammonds may have contracted for, they did not direct or control, Lane's work. *See Rimoldi v. Schanzer*, 147 A.D.2d 541, 537 N.Y.S.2d 839, 842 (2d Dept.1989); *Schwartz v. Foley*, 142 A.D.2d 635, 530 N.Y.S.2d 281, 282–83 (2d Dept.), *appeal denied*, 73 N.Y.2d 702, 536 N.Y.S.2d 743, 533 N.E.2d 673 (1988). Therefore, we agree that the Hammonds' motion for summary judgment was properly granted.

Judgment reversed in part, affirmed in part.