**J.D. COUSINS & SONS, INC.,**
**Plaintiff–Appellant,**

**v.**

**HARTFORD STEAM BOILER IN-SPECTION AND INSURANCE COM-PANY, Defendant–Appellee.**

**Docket No. 02–9277.**

United States Court of Appeals,
Second Circuit.

Argued: June 4, 2003.

Decided: Aug. 21, 2003.

Michael R. McGee (Jennifer L. Friedman, on the brief), McGee & Gelman, Buffalo, NY, for Plaintiff–Appellant.

Robert A. Assuncao, Piper Rudnick LLP, New York, NY, for Defendant–Appellee.

Before: SACK and SOTOMAYOR, Circuit Judges and BRIEANT, District Judge *.

BRIEANT, District Judge.

Plaintiff–Appellant ("Cousins") seeks to review a grant of summary judgment in favor of Defendant–Appellee ("Hartford") in this action for a breach of contract to perform inspection services. New York law applies to this diversity suit.[1] While we do not agree with the district court that the issue may be resolved by finding that the inspector acted in subjective good faith, we conclude that on the totality of the facts presented in this comprehensive record, the conduct of the inspector was objectively reasonable and therefore affirm.

I

The following facts are clearly established in the record. The American Society of Mechanical Engineers ("ASME") publishes and revises from time to time various standards or codes for the design and construction of machinery, including pressure vessels, which will perform in a

---

* The Honorable Charles L. Brieant of the United States District Court for the Southern District of New York, sitting by designation.

1. Counsel for Cousins conceded at oral argument that New York law applies.

safe and reliable manner. Approved fabricators, including Cousins, are authorized by ASME to construct such equipment and machinery.[2] Following completion and final test and inspection by an Authorized Inspector employed by an Authorized Inspection Agency, such as Hartford, a product which satisfies the code becomes eligible for attachment of the ASME seal. Presence of the ASME seal is a legal requirement in many states for operating certain equipment, including pressure vessels, and is required by most insurers and plant operators.

On April 25, 1997, Centorr Vacuum Industries ("Centorr"), which was not a code shop, contracted with Cousins for the design and construction of a horizontal pressure vessel to become the central component of an autoclave which Centorr had agreed to sell to its own customer, to be used in the manufacture of tungsten carbide. An ASME seal was a requirement of the Centorr purchase order. The vessel was to be cylindrical measuring seven feet in length and four feet interior diameter with quick opening full size doors at each end with o-ring gaskets. As part of the sintering process it was intended to operate at 1,480 C. filled with Argon gas at 900 psi. Failure of such a vessel while operating under such heat and pressure could be a first class disaster to life and property.

Cousins had a pre-existing contract with Hartford to provide intermittent inspection service of an Authorized Inspector when requested.

That contract also provided that Hartford agreed in relevant part:

3.(a) That the Authorized Inspector will make such inspections as he may deem necessary to permit him to certify to the best of his belief, that, components, parts, appurtenances and/or piping subassemblies comply with the requirements of the applicable Section of the ASME Code, the laws of the localty [sic] in the United States or Canada, in which the object will be used, or both.

3.(b) That the Authorized Inspector will make such inspections as he may deem necessary to permit him to certify to the best of his belief, that, components, parts, appurtenances and/or piping subassemblies beyond the scope of Paragraph A–3.(a), comply with the requirements of the Customer's specifications, provided these specifications detail the inspection requirements and these requirements have been agreed to by the Company.

4.(a) That the Authorized Inspector will sign an ASME Manufacturer's Data Report or other document required by the laws of the locality in which the object will be installed for each newly constructed component, part, appurtenance and/or piping subassembly which he has assured himself meets the requirements of Paragraph A–3.(a) of this agreement.

4.(b) That the Authorized Inspector will sign a Manufacturer's Data Report (prepared by the Customer) for each newly constructed component, part, appurtenance and/or piping subassembly described in Paragraph A–3.(b). It will be the responsibility of the Customer to insure that the above certification is acceptable to the user, his agent or licensing agency at the site of installation.

5. That the Authorized Inspector will authorize the application of stamping to the component, part, appurtenance and/or piping subassembly as required by the applicable Section of the ASME Code or the laws of the locality in which the object is to be used.

and Cousins agreed in relevant part:

2. That the Customer [Cousins] will indemnify, defend and save harmless the

---

2. Such a company is known as a "code shop".

Company from and against any and all loss, damage, injury, both to persons and property, liability and all claims or suits therefor, by, or on behalf of, any person, concern or corporation, when such loss, damage, injury or liability is alleged to have arisen from the negligent performance of, or the negligent failure to perform, any test or inspection in connection with activities performed under this contract or is alleged to have arisen from any breach of any warranty in connection with such activities, except when such loss, damage or injury results from acts of negligence on the part of the Company's Inspectors where such acts are outside the scope of the actual inspection or where such acts, within the scope of the actual inspection, result solely from the conduct of the Inspector. 3. That the Customer shall procure and maintain during the life of this contract public liability insurance, including products (completed operations) coverage, for both bodily injuries, or death resulting therefrom, and property damage, with limits of liability as agreed upon during initial negotiations, unless this condition is waived by the Company.

The initial delivery date for the vessel was September 1997. A series of design and fabrication difficulties delayed completion and on several occasions prior to April 1, 1998, the vessel failed pressure tests conducted under the supervision of Mr. Allen Premschetz, Hartford's Authorized Inspector (AI) assigned to the matter. Representatives of Centorr began to lose confidence in the work of Cousins. On April 1 and 2, 1998, the vessel was again pressure tested at Cousins' premises under the supervision of AI Premschetz in the presence of two Centorr representa-tives and a representative of Cousins, Mr. Gary Bailey. There was a small leak of water and attached gauges appeared to reflect a distortion of the metal of the doors. Mr. Premschetz, who had been the assigned AI from the inception of the job expressed himself as willing to approve the work and sign off on the required documentation so that the ASME seal could be affixed. The two Centorr representatives objected and claimed that the vessel was not in compliance with code. An argument ensued in which voices were raised and the AI agreed not to sign off on the data sheet that day. Within a week, the AI received a directive from his superior at Hartford, Mr. James Wolcott, an Authorized Inspectors' Supervisor for ASME, not to sign until "code related non-conformances" raised by Centorr had been addressed and resolved.

It is a fair inference from the evidence that Centorr, seeking to cast Cousins in breach of contract, spooked Premshetz's superiors at Hartford to prevent issuance of the data sheet needed to obtain the ASME seal by raising issues of claimed non-conformity.[3]

Faced with representations by Centorr that on April 1–2, 1998 the doors of the vessel had leaked and that deformation of metal on the doors had been measured, and that the vessel was unsafe and not in compliance, Thomas Pastor of Hartford undertook to review the issues of compliance and determine whether the design calculations complied with ASME Code. He found that the design calculations were in error, a point conceded by Mr. James Porebski, Cousins' engineer consultant. Initially he considered that the shell flange design was based on incorrect assumptions. In early May 1998 he concluded

3. On April 22, 1998, Centorr formally cancelled its contract with Cousins for failure to perform. A subsequent commercial arbitra-tion with Cousins was resolved in favor of Centorr. The district court gave this fact no weight, nor do we.

that this conclusion (based on a similar case involving *Boeing)* was mistaken and that there was no problem with the flange. Mr. Pastor counseled with Professor Kalnins, a recognized authority, to analyze whether the vessel met the design maximum allowable working pressure. He concluded that it did. Mr. Pastor agreed with Professor Kalnins' findings. It turned out that later, in June 1998, a revision in the ASME code permitted certification. After making a full investigation, Pastor concluded, in February 1999, that the vessel was in compliance with code and that the Manufacturer's Data Report should be signed by the AI. Only minor changes of substance were made to the vessel between April 1998 and February 1999, and there was no re-test. For want of a timely inspection certificate, Cousins was required to refund all payments received from Centorr. This lawsuit followed.

## II

The district court concluded on all the evidence presented that Hartford acted in good faith and we agree. Judge Skretny concluded that the contract between Cousins and Hartford came within that very limited class of cases in New York where the promisee's satisfaction with performance, (or, in this case, the inspector's satisfaction that the vessel met code), is subjective rather than objective. Expressed differently, if the standard is objective, a decision to reject test performance must be reasonable, while if the subjective standard applies, it need only be shown to be honest and in good faith.

■ Whether the standard for contract performance is objective or subjective is a matter of intent and except in the case of an ambiguity is usually determined as a matter of law. We conclude that the objective standard was intended to apply in this case. Whether a vessel complies with the applicable ASME standard and is safe are clearly both external and objective facts, similar to issues of merchantability, operative fitness or mechanical utility, which are typically adjudicated under the standard of objective reasonableness. The New York Court of Appeals has held that:

> While the power to withhold approval is an untrammelled one where the object of the contract is "to gratify taste, serve personal convenience, or satisfy individual preference," a different rule ordinarily prevails, in this state, for commercial contracts where the suitability of the goods is a matter of "mechanical fitness, utility, or marketability"; in such a case, the contract is "construed as imposing upon the seller the requirement only that a reasonable man * * * be satisfied with the performance."

*Alper Blouse Co. v. E.E. Connor & Co.,* 309 N.Y. 67, 70–71, 127 N.E.2d 813 (1955) (citations omitted).

■ That an objective standard was intended by the parties also seems clear from the provision for indemnification, which shows that both parties realized the potential for negligence claims against Hartford by injured third parties in the event of an explosion or similar failure. Were actual, idiosyncratic satisfaction of the inspector the standard, there could be no breach of the duty to exercise reasonable care in certifying compliance. Since the inspector is not the person for whom the goods are being manufactured, and the item is certainly not being made to the personal taste of the inspector, the test of objective compliance with the code is applicable. As noted in a recognized text:

> In determining the proper interpretation of any contract, it is appropriate to consider the subject matter of the bargain, and if the contract involves a picture or other work or art, this tends to show that the parties actually intended per-

sonal satisfaction to be the sole determining factor. If, on the other hand, the subject mater of the contract is a machine, as all a buyer would naturally want would be that the machine should function properly, it is more probable that a provision for satisfaction means satisfaction of a reasonable person, and in case of doubt, the latter interpretation as the less harsh would appropriately be adopted.* * * * So where, even though the contract calls for a satisfactory performance, it also states its own standards of such performance, such as by definite tests or specifications, clearly the satisfaction of one of the parties is not made the sole determining factor. WILLISTON ON CONTRACTS 4TH ED. § 38.22.

## III

Cousins argues that applying this objective reasonableness standard, summary judgment was improperly granted because Hartford admitted that Premschetz was satisfied on April 1, 1998 that the vessel was compliant, and was prepared to certify the vessel on April 10, but then changed his mind based on Pastor's concerns. Cousins appears to recognize, however, that an inspector *may* change his mind when "the reasons therfore are *reasonable* and satisfy the *objective* satisfaction standard." Appellant's Brief at 44.

█ Cousins points to two circumstances that support its claim of unreasonableness. First, that Pastor instructed Premschetz to withhold certification based on his misunderstanding of the flange design. But Cousins acknowledges that "[i]n April 1998, Pastor ... [was] admittedly under a substantial misunderstanding with respect to the flange design of the Vessel.

Pastor erroneously believed that the Vessel's flange design was similar to a controversial Boeing flange design. The Boeing flange design had recently been the subject of ASME Code discussions." Pastor did not, however, learn that the flange design was not in fact similar to the Boeing design until after April 23, 1998, and nothing in the record suggests that Pastor's misunderstanding was based on negligence. Accordingly, this evidence, without more, does not suggest that HSB's refusal to certify while it determined whether the flange design was in fact similar to the flawed Boeing design was objectively unreasonable.

Second, Cousins argues that Pastor relied on incorrect information from Centorr employees, who had contracted him following an ASME-required hydrotest (during which the vessel apparently had leaked in some way), and suggested that there was a design defect. Again, the mere fact that the reports from the employees ultimately were found to be incorrect is not enough to establish objective unreasonableness. In fact, we are inclined to believe that any reasonable inspector in Premschetz's position, having learned from a supervisor that there were substantial questions about whether the vessel had in fact passed the hydrotest or suffered from a permanent distortion, would have withheld certification pending resolution of those issues.

The AI in this case bore a heavy responsibility. Centorr, its ultimate customer and members of the public, including those to be employed in the tungsten carbide plant who would suffer injury or death in the event of an explosion of the autoclave, all would be at risk in the event Hartford negligently approved and sealed an unsafe or defective vessel.[4] *See e.g. Glanzer v.*

---

4. Before the final cold water pressure test on April 1, 1998, Mr. Bailey, Cousins' engineer-

ing consultant, warned those in attendance to stand back because during a prior failed test

*Shepard,* 233 N.Y. 236, 135 N.E. 275 (1922) (a public weigher, hired by a seller of beans to certify the weight of a particular shipment, was found liable in negligence to the buyer); *Brown v. Neff,* 159 Misc.2d 186, 603 N.Y.S.2d 707 (1993) (authorized state motor vehicle inspector held liable to person injured for negligent misrepresentation that truck was safe); Restatement (Second) of Torts §§ 323–324A.

■ The greater the risk, the higher the standard of reasonable care. *Miner v. Long Island Lighting Co.,* 40 N.Y.2d 372, 379, 386 N.Y.S.2d 842, 353 N.E.2d 805 (1976); *Caldwell v. Village of Island Park,* 304 N.Y. 268, 274, 107 N.E.2d 441 (1952); *Mikula v. Duliba,* 94 A.D.2d 503, 505, 464 N.Y.S.2d 910 (4th Dept.1983).

Hartford, under all the circumstances was under a duty to respond reasonably to the criticisms of the two Centorr test observers, one of whom was a senior mechanical engineer. Mr. Pastor, acting for Hartford reviewed the design report of Cousins for the vessel, which he found incomplete and to contain conceded errors in calculation. After exercising due diligence and reasonable care under the circumstances as noted earlier Hartford approved the vessel and signed the Data Report to allow issuance of the ASME seal. Because no reasonable juror could find that Hartford and its employees failed to exercise reasonable care under the circumstances, in delaying issuance of the Data Report until plausible objections of the customer could be resolved, the grant of summary judgment was proper. We affirm.

the vessel shot high pressure water 40 feet across the room.