RIVERA, J. (concurring):
Defendants are electrical power suppliers for customers in Suffolk and Nassau Counties and parts of Queens County, New York. Defendant Long Island Power Authority (LIPA) is a publicly-owned power authority created in 1986 to replace the existing investor-owned utility, defendant Long Island Lighting Company (LILCO), for the purpose of "assuring the provision of an adequate supply of electricity in a reliable, efficient and economic manner" to LILCO's customers (see Public Authorities Law § 1020-a ). As the majority acknowledges ***731 "[t]his takeover was anomalous," both in scope and concept, as historically, New York's electrical needs have been met by the private sector through a market-driven proprietary model of services (majority op. at 729, 70 N.Y.S.3d at 915-16, 94 N.E.3d at 477; see Braun v. Buffalo Gen. Elec. Co., 200 N.Y. 484, 94 N.E. 206 [1911] ; Miner v. Long Island Lighting Co., 40 N.Y.2d 372, 386 N.Y.S.2d 842, 353 N.E.2d 805 [1976] ). Plaintiffs sued defendants for property damage allegedly caused by defendants' failure to de-energize part of its customer service area during Superstorm Sandy. Defendants moved to dismiss on the ground that LIPA, and as a consequence the codefendants, are immune from suit for acting in LIPA's governmental, as opposed to proprietary, capacity.
I agree with the majority that defendants failed to carry their burden on the motion because the amended complaints state cognizable claims for relief based on defendants' alleged negligence (majority op. at 728-730, 70 N.Y.S.3d at 914-16, 94 N.E.3d at 476-77). However, I disagree with the majority's suggestion that defendants may be able to establish an affirmative defense of immunity at some later stage in this litigation (majority op. at 730 n. 2, 70 N.Y.S.3d at 916 n. 2, 94 N.E.3d at 477-78 n. 2). The majority essentially invites the parties to engage in further motion practice on defendants' purported entitlement to immunity. In doing so, it encourages the parties to incur unwarranted litigation costs and needlessly expend judicial resources on an argument that has no possibility of success. A governmental entity that replaced a private entity to supply a service that historically has been provided by private entities, in a manner indistinguishable from those private entities, simply cannot be said to be acting in a governmental capacity. LIPA's decision not to de-energize is decidedly proprietary *479 because its "activities essentially substitute for or supplement 'traditionally private enterprises' " ( Sebastian v. State, 93 N.Y.2d 790, 793, 698 N.Y.S.2d 601, 720 N.E.2d 878 [1999], citing Riss v. City of New York, 22 N.Y.2d 579, 581, 293 N.Y.S.2d 897, 240 N.E.2d 860 [1968, Breitel, J.] ). Regardless of how LIPA characterizes its actions, they were not undertaken "pursuant to the general police powers" and did not involve a governmental function ( Balsam v. Delma Eng'g Corp., 90 N.Y.2d 966, 968, 665 N.Y.S.2d 613, 688 N.E.2d 487 [1997] ). Therefore, as a matter of law, defendants are not entitled to an affirmative defense of immunity from suit under the theory that they acted in a governmental capacity.
New York's doctrine of governmental immunity furthers important societal interests.
"This limitation on liability reflects separation of powers principles and is intended to ensure that public servants are free to exercise their decision- ***732 making authority without interference from the courts. It further reflects a value judgment that-despite injury to a member of the public-the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury" ( Valdez v. City of New York, 18 N.Y.3d 69, 76, 936 N.Y.S.2d 587, 960 N.E.2d 356 [2011] [internal quotation marks omitted] ).
Our law is well-settled that a governmental entity may be subject to liability under ordinary principles of tort law for "activities which have displaced or supplemented traditionally private enterprises... [and] activities of government which provide services and facilities for the use of the public" because these actions are performed in the entity's proprietary capacity ( Riss, 22 N.Y.2d at 581, 293 N.Y.S.2d 897, 240 N.E.2d 860 ). In contrast, absent a special duty to the injured party, a governmental entity may assert a defense of immunity to a negligence suit for actions taken in performance of its governmental function ( Sebastian v. State, 93 N.Y.2d 790, 793, 698 N.Y.S.2d 601, 720 N.E.2d 878 [1999] ).
The application of the doctrine requires careful review to determine whether the entity's actions have proprietary characteristics.
"This Court has recognized that a 'governmental entity's conduct may fall along a continuum of responsibility to individuals and society deriving from its governmental and proprietary functions.' At one end of the continuum lie purely governmental functions 'undertaken for the protection and safety of the public pursuant to the general police powers.' ...
On the opposite periphery lie proprietary functions in which governmental activities essentially substitute for or supplement 'traditionally private enterprises' " ( id. at 793, 698 N.Y.S.2d 601, 720 N.E.2d 878 [citations omitted] ).
To determine whether a function is proprietary or governmental, the courts must examine
"the specific act or omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred ..., not whether ***733 the agency involved is engaged generally in proprietary activity or is in control of the location in which the injury occurred" ( Miller v. State of New York, 62 N.Y.2d 506, 513, 478 N.Y.S.2d 829, 467 N.E.2d 493 [1984] ).
*480 The critical factor in determining whether the governmental entity is acting pursuant to a governmental function is determining if it exercised its police powers for the protection and safety of the public in carrying out the action challenged by a plaintiff ( Applewhite v. Accuhealth, Inc., 21 N.Y.3d 420, 425, 972 N.Y.S.2d 169, 995 N.E.2d 131 [2013] ). If not, the entity is understood to be acting as its private sector counterpart, without the need for immunity to ensure the proper deployment of limited governmental resources. Examples of governmental functions attributed to the general police powers include police and fire protections, oversight of juvenile delinquents, issuance of building permits or certificates of occupancy, certifying compliance with fire safety codes, teacher supervision of a public school playground, boat inspections, garbage collection, and traffic regulations (see id. at 425-426, 972 N.Y.S.2d 169, 995 N.E.2d 131 ). Each of these examples manifest policy choices based on social norms and political considerations that at their core require balancing society's interests in protecting the public welfare, health, and safety against the interests of the individual.
LIPA's challenged action here does not involve the exercise of the police power. Its decision not to de-energize is no different than those historically made by private actors. In fact, its private sector counterpart, Con Edison, faced this very same decision in the days and hours before the storm. We need only compare this decision with a true exercise of the police power under the circumstances of a storm emergency to understand why LIPA's actions were proprietary. As the storm approached, the deployment of law enforcement personnel, fire fighters, emergency medical providers, and other first responders, was a clear governmental act ( id. at 425, 428, 972 N.Y.S.2d 169, 995 N.E.2d 131 ["Police and fire protection are examples of long-recognized, quintessential governmental functions," and EMT and other first responders fulfill a government function] ). Similarly, the decision to evacuate parts of New York City could only be accomplished by means of the government exercising its police powers in the course of an emergency. In contrast, LIPA's actions did not involve decisions about these limited governmental resources, which are at the core of those governmental actions.
I agree with the majority that the fact that LIPA was responding to a severe storm does not itself mean that its ***734 behavior constituted governmental action (majority op. at 730, 70 N.Y.S.3d at 916, 94 N.E.3d at 477-78). Nor would the fact that LIPA took into consideration the choices of other governmental actors, such as various entities' decisions about evacuating particular areas and deploying first responders, make its decision "governmental." Con Edison did the same. Additionally, to the extent that LIPA's actions were taken at the behest of some governmental command, this may bear upon LIPA's eventual liability under traditional negligence principles, not whether LIPA acted in a governmental capacity. Again, a private utility would respond to governmental directives in the same way.
It is not disputed that the provision of electricity has traditionally been a proprietary enterprise undertaken by private entities (see Prosser & Keeton, Torts § 131 at 1053 [5th ed 1984] ["(I)f the city operates a local electric or water company for which fees are charged, this looks very much like private enterprise and is usually considered proprietary."] ).[1] LIPA replaced a *481 private entity-LILCO-and as such its "activities essentially substitute for or supplement traditionally private enterprises" ( Sebastian, 93 N.Y.2d at 793, 698 N.Y.S.2d 601, 720 N.E.2d 878 [internal quotation marks omitted] ). Our courts have frequently held private utility companies subject to liability under ordinary rules of negligence, including LILCO (see e.g. Miner, 40 N.Y.2d at 375, 386 N.Y.S.2d 842, 353 N.E.2d 805 ). Indeed, defendants concede that LIPA's "core function-the routine operation and maintenance of its electric utility equipment on a 'blue sky day'-is proprietary."
This case is distinguishable from In re World Trade Ctr. Bombing Litig., in which the Court found that the Port Authority had security concerns of a drastically different quantitative and qualitative register than most landowners and that the administration and deployment of security at the World Trade Center (WTC) involved discretionary decision-making about allocating security and police resources ( 17 N.Y.3d 428, 449, 933 N.Y.S.2d 164, 957 N.E.2d 733 [2011] ). First, nothing suggests that LIPA faces different public safety concerns than the private companies in the region, including those providing power to customers directly across ***735 Jamaica Bay, as well as different parts of New York City (see Heeran, 141 A.D.3d at 565-566, 36 N.Y.S.3d 165 ). While, as the Moreland Commission on Utility Storm Preparation and Response observed, the purpose of the de-energization process, broadly speaking, "is to protect the public from fire and electrical hazards posed by wiring and circuits that may have come into contact with flood water," LIPA was required to protect its customers from the commodity it supplies, in the same way, and with the same considerations, as a private utility company.[2]
Second, there is nothing to suggest that the decision not to de-energize implicated the general police powers of the state. In In re World Trade Ctr., the Port Authority was tasked with administering security measures to counter criminal and terrorist activity for its tenants and everyone who used the WTC facility, which required determining how best to allocate its finite resources ( 17 N.Y.3d at 449, 933 N.Y.S.2d 164, 957 N.E.2d 733 ). As the Court noted there, "[p]olice protection ... is a quintessential example of a governmental function as it involves 'the provision of a governmental service to protect the public generally from external hazards and particularly to control the activities of criminal wrongdoers' " ( id. at 448, 933 N.Y.S.2d 164, 957 N.E.2d 733, quoting Riss, 22 N.Y.2d at 581, 293 N.Y.S.2d 897, 240 N.E.2d 860 ). What distinguishes police protection from other decisions made by governmental entities is that it is "limited by the resources of the community and by a considered legislative-executive decision as to how those resources may be deployed" ( In re World Trade Ctr., 17 N.Y.3d at 448, 933 N.Y.S.2d 164, 957 N.E.2d 733, quoting *482 Riss, 22 N.Y.2d at 581-582, 293 N.Y.S.2d 897, 240 N.E.2d 860 ). Indeed, crime prevention is "a classic example of a governmental function" and that this function "has traditionally been assumed by police rather than by private actors is a tell-tale sign that the conduct is not proprietary in nature" ( Balsam, 90 N.Y.2d at 968, 665 N.Y.S.2d 613, 688 N.E.2d 487 ). While we have acknowledged that government entities conduct may fall on a continuum between purely proprietary and purely governmental functions, and that a governmental entity may have a "dual role" in performing both (see Miller, 62 N.Y.2d at 511, 478 N.Y.S.2d 829, 467 N.E.2d 493 ), unlike WTC, nothing moves LIPA's actions off the proprietary end of the continuum. Its sole role is proprietary in nature: the efficient delivery of electrical services to its customers. ***736 LIPA and codefendant National Grid were aware that a major storm capable of flooding the Rockaway Peninsula was about to hit the region, and that this could create a fire hazard if certain areas vulnerable to flooding were not de-energized. They were also aware that de-energizing could potentially bring its own risks, as it could affect those unable to evacuate and those responding to the storm. Had LIPA never taken over from LILCO, however, a private utility company would have been faced with this precise dilemma, as were other private utility providers in the region on that day. The magnitude of the storm did not in any way generate a situation in which defendants' activities did more than substitute for or supplement a traditional private enterprise. Utility companies provide power not only when the sky is blue, but also during intense blizzards, thunderstorms, hurricanes, and other treacherous weather events. Superstorm Sandy may have been one of the more severe storms to hit New York, but preparing for it and reacting to it was a proprietary function.
The fact that electrical services have traditionally been delivered through private enterprises and that the legislature supplanted privately-owned LILCO with publicly-owned LIPA for the sole purpose of ensuring the efficient delivery of electricity to LILCO's customer base leads to the conclusion that LIPA's decision not to withhold delivery of that commodity was unquestionably a proprietary act. The majority's suggestion that some as-yet-unknown fact may come to light at some future point in this litigation that might illuminate defendants' conduct, and transform LIPA's decision not to de-energize into a governmental action, has no grounding in law or the reality of public utility services. LIPA's decision to keep the lights on was not an exercise of the police power.
In Connolly v Long Is. Power Auth. , Baumann v Long Is. Power Auth. and Heeran v Long Is. Power Auth. (LIPA) : Order affirmed, with costs, and certified question answered in the affirmative.
Chief Judge DiFiore and Judges Wilson and Feinman concur. Judge Rivera concurs in result in an opinion, in which Judge Fahey concurs. Judge Garcia took no part.

LIPA stresses that the legislature specified that LIPA would be performing an "essential government function" (Public Authorities Law § 1020-p [1 ] ), but as the Appellate Division majority points out, similar language is in the laws creating other public authorities that definitely carry out proprietary activities, such as the White Plains Parking Authority or the Upper Mohawk Valley Memorial Auditorium Authority (see Heeran v. Long Is. Power Auth. [LIPA], 141 A.D.3d 561, 566, 36 N.Y.S.3d 165 [2016], citing Public Authorities Law §§ 1427[2], 1942[5] ).

The Moreland Commission was established by Governor Andrew M. Cuomo in November 2012 to investigate the response, preparation, and management of the State's power utility companies with respect to major storms afflicting the State (The Moreland Commission on Utility Storm Preparation and Response, https://utilitystormmanagement.moreland.ny.gov/ [last accessed Jan. 20, 2018] ).