█ IRVING MALAWER, Appellant, v NEW YORK CITY TRANSIT AUTHORITY et al., Respondents. [795 NYS2d 201]—

Order, Supreme Court, New York County (Robert D. Lippmann, J.), entered September 26, 2003, which granted defendants' motion for summary judgment dismissing the complaint, reversed, on the law, without costs, the motion denied and the complaint reinstated.

On March 6, 2001 at approximately 5:00 P.M., plaintiff slipped and fell on an icy subway grating as he was exiting the front doors of a city bus headed northbound on Eighth Avenue. The bus had stopped on the east side of the avenue, between 40th and 41st Streets. As a result of his fall, the 86-year-old plaintiff fractured his pelvis. He brought this action against the New York City Transit Authority (NYCTA) and Manhattan and Bronx Surface Transit Operating Authority (MABSTOA) alleging that defendants breached their duty to ensure the safe discharge of a passenger at a designated bus stop, and claiming that the driver's decision to stop the bus with its front doors over a wet and slippery subway grating constituted actionable negligence.

At his General Municipal Law § 50-h hearing, plaintiff testified that he was getting off the bus, that he still had one foot on

the doorway stairs, and "as [he] stepped on the metal grating, [he] really took a tremendous fall." At his deposition, plaintiff recounted that he was the first person to exit the front door of the bus, and that he did not remember whether there was anyone behind him getting off the bus.

Plaintiff also asserted that he had disembarked at the subject bus stop almost every weekday for the previous four years, and that the driver left passengers off at different spots along the avenue on different days. Plaintiff testified that it was cold and drizzly on the date of his accident, and that he noticed snow in spots, that "the metal grating was all ice," and that there were other spots along the sidewalk which were not next to the metal grating which "looked clear" of snow and ice. After plaintiff was helped to his feet, he had an opportunity to look up and down the block. He testified that at this point, "I said to myself 'why didn't [the bus driver] stop over here? It was clean.' " Plaintiff also testified that the area by the corner of the street, and "another spot a little further back" were both clear of snow and ice. Photographs submitted by plaintiff in opposition to defendants' motion reveal that there are no metal gratings in the northern portion of the block, closest to the bus stop.

Defendants moved for summary judgment. The court granted the motion, stating: "Plaintiff's own description of the manner in which he fell indicates that he fell backwards. Since plaintiff claims that he was the first passenger to exit the bus and that he was assisted to his feet by pedestrians who were walking on the sidewalk rather than the passengers who were attempting to exit the bus after him, plaintiff has not demonstrated that he was unable to safely alight from the bus, but only that he stepped on a perilous spot after alighting from the bus." The motion court concluded that defendants' negligence was not a proximate cause of plaintiff's injuries as a matter of law because plaintiff had exited the bus before he actually fell, and because he was assisted up by pedestrians, rather than passengers exiting behind him. This conclusion is based upon a misunderstanding of the facts and the applicable law.

To begin, plaintiff specifically testified that "[w]hen I got off the bus with one foot, as soon as I took the other foot off, I slipped." In addition, plaintiff testified that he did not remember any other passengers exiting by way of the front door after him. Thus, there is no evidence that plaintiff had safely exited the bus before he fell, and the fact that plaintiff was assisted by pedestrians rather than other passengers, is not relevant to the inquiry as to whether he had safely alighted the bus.

A common carrier owes a duty to its passengers to stop at a

place where they may safely disembark and leave the area (*Miller v Fernan*, 73 NY2d 844, 846 [1988]; *Jenkins v New York City Tr. Auth.*, 262 AD2d 455 [1999]). Liability rests upon a "finding that the placement of the bus dictates that the passenger, in order to board [or exit] the bus, must negotiate a dangerous or defective path" (*Gross v New York City Tr. Auth.*, 256 AD2d 128, 129 [1998]). Whether a common carrier has breached its duty in this regard is generally a question of fact to be determined by the jury (*id.*). To prevail on their motion for summary judgment, defendants were required to set forth evidentiary facts sufficient to entitle them to judgment as a matter of law (CPLR 3212 [b]). Defendants did not meet this burden.

The dissent asserts that when the bus was stopped, plaintiff had a better vantage point than the bus driver to observe the condition of the subway grating below him. However, plaintiff's failure to see ice on the grating as he stepped off the bus does not conclusively negate an inference that the driver could have been aware of a hazard. The driver of this bus has not been identified, and never testified as to what he could see upon approaching the bus stop, or thereafter. Given record evidence that portions of this sidewalk were covered with snow and ice, and that other portions were clear, the issue of whether this driver met the duty to stop the bus at a safe location, and whether the path afforded to this plaintiff was reasonably safe is a question for the jury and is not resolved on the record before us.

The dissent's reliance upon *Cuellar v City of New York* (5 AD3d 530 [2004]) and *Diedrick v City of New York* (162 AD2d 496 [1990]) is misplaced. There are no facts stated in the *Cuellar* decision, making it impossible to fairly compare that case to this one. *Diedrick* is also inapposite. First, it was in a distinct procedural posture from this case. In *Diedrick*, the appeal was from the grant of defendant's trial motion to dismiss, made after the close of plaintiff's case, not a motion for summary judgment, as here. Moreover, the cases are dissimilar on their facts. Trial testimony in *Diedrick* established that the plaintiff had exited a bus and had taken "several steps on the grassy part of the sidewalk" before she fell into a hole (*id.*). The Second Department affirmed the grant of defendant's trial motion to dismiss, concluding that "the carrier's duty terminates when it provides the passenger a safe alighting point" (*id.* at 497). The Court in *Diedrick* also observed that "[plaintiff's] decision to proceed as she did was a voluntary one, and that alternate safe paths were available to her" (*id.*). In direct contrast to *Diedrick*, it is uncontested that this accident happened while plaintiff was

in the process of getting off the bus, as he took his first step. There is no question that when this accident occurred, the carrier's duty had not yet terminated.

The dissent engages in more speculation, postulating that at the time of plaintiff's accident, the driver "presumably was focusing his attention on the surrounding traffic." This presumption presupposes facts not in the record, and, in any event, is of questionable relevance to the contested issues. The driver of the bus has not yet been located, and there is nothing in the record about what he was doing. But the record does show the accident occurred after the bus was stopped with its doors open. At this point, as *Miller (supra)* instructs, the driver should have directed attention to the passengers leaving and boarding the bus. If one were to accept the dissent's hypothesis that the driver was watching the traffic after the bus had stopped, then clearly he was not discharging the duty of protecting the safe passage of individuals, such as plaintiff, leaving and entering its care.

Accordingly, as the record shows that there are outstanding issues of fact as to whether the driver's determination to stop the bus with its front doors above an icy subway grating, rather than in an area clear of snow and ice, was a breach of the duty to provide safe egress, we reverse the order appealed and reinstate the complaint (*see Miller, supra*; *see also Conetta v New York City Tr. Auth.*, 307 AD2d 333 [2003]; *Patterson v New York City Tr. Auth.*, 276 AD2d 474 [2000]; *Jenkins, supra*; *Dunham v City of New York*, 262 AD2d 444 [1999]; *Tolbert v New York City Tr. Auth.*, 256 AD2d 171 [1998]).

We must be guided on this appeal by the well-established principles regarding summary judgment motions, not by our subjective view of how a jury should decide the case. Here, the record indicates that it was cold and drizzly on the night of the accident, that the sidewalk had some areas that were snowy, and other that appeared to plaintiff clear of snow and ice. A portion of the sidewalk contained ice-covered metal subway gratings, an unidentified driver pulled up to the curb next to these gratings, and plaintiff slipped and fell as he attempted to exit the bus. Our holding is straightforward. The extant record does not establish, as a matter of law, that the driver of this bus did not breach the duty set forth in *Miller (supra)*. The *Miller* rule requires the driver of a bus to discharge its passengers at a reasonably safe location. Generally, the issue whether the common carrier breached its duty in the circumstances is one for the jury (*Gross*, 256 AD2d at 129). This case presents no exception to the general rule (*id.*). Concur—Mazzarelli, J.P., Gonzalez and Catterson, JJ.

Friedman and Williams, JJ., dissent in a memorandum by Friedman, J., as follows: The majority today holds that defendant transit authorities may be held liable for their driver's discharge of plaintiff from a bus next to an icy metal grating, on which plaintiff slipped and fell. The majority reaches this conclusion even though plaintiff himself testified that, in the "cold and drizzly" conditions prevailing that day, he could not see the ice on the grating *when he was looking directly at it as he stepped off the bus*. It was only *after* he had fallen that plaintiff claimed to have seen the ice on the grating, or even to have noticed that the grating appeared to be slippery. It is plaintiff's theory, which the majority apparently adopts, that a verdict in his favor may nonetheless be based on speculation that the bus driver may have been able to see the ice on the grating, and, if so, should have picked a safer spot to stop the bus (*see Miller v Fernan*, 73 NY2d 844, 846 [1988]). The driver, however, was far less favorably situated than plaintiff to observe the grating, since he was seated inside the bus, on the side away from the curb, at an elevated height, and presumably was focusing his attention on the surrounding traffic. Thus, plaintiff's uncontradicted testimony that the ice on the grating could not be seen from the bus steps establishes, a fortiori, that the ice also could not be seen from the less favorable vantage point of the bus driver's seat. The record thus conclusively negates any inference that the driver was aware, or reasonably should have been aware, of the hazardous condition that caused plaintiff's fall. Since this is an essential element of plaintiff's claim (*see Cuellar v City of New York*, 5 AD3d 530, 531 [2004]; *Diedrick v City of New York*, 162 AD2d 496, 497 [1990]), defendants are entitled to judgment in their favor as a matter of law. Accordingly, I respectfully dissent from the majority's reversal of the order granting defendants summary judgment.[1]

A review of the record evidence makes clear that plaintiff could not see the ice on the grating as he walked down the steps of the bus, even though he was looking directly at the grating during his descent. The incident occurred near the Port Author-

---

1. I recognize that defendants, in moving for summary judgment before Supreme Court, failed to raise the argument that plaintiff's testimony established that there was no issue of fact as to whether the bus driver was aware, or should have been aware, of the grating's icy condition. Nonetheless, we may consider this argument, now that defendants have raised it on appeal, since it is based on facts that appear on the face of the existing record, and— given that the argument is based on plaintiff's own sworn testimony—the argument could not have been defeated by plaintiff had defendants raised it in the motion court (*see Chateau D'If Corp. v City of New York*, 219 AD2d 205, 209-210 [1996], *lv denied* 88 NY2d 811 [1996]).

ity Bus Terminal, at about 5:00 P.M. on March 6, 2001, which plaintiff described as a "cold and drizzly" day. At the General Municipal Law § 50-h hearing, plaintiff testified as follows:

"Q. Okay. And let me ask you, as you were stepping off the bus, do you remember where you were looking, were you looking straight ahead, were you looking to your right, your left, downward, do you remember where you were looking?

"A. *I was looking down, ahead.*" (Emphasis added.) At his deposition, plaintiff gave the following testimony:

"Q. Did you notice what the sidewalk looked like just in front of you as you exited the bus in terms of whether there was any snow or ice?

"A. Yes. I didn't notice it, but when I got off the bus, it was the metal grating. I put one foot off and as I put my foot off and released my hold, I slipped.

"Q. Where was the snow and ice that you just alluded to?

"A. There was ice exactly which I found out when I got off. The whole section there was icy. When I got off the bus with one foot, as soon as I took the other foot off, I slipped."

Later, plaintiff's deposition continued:

"Q. So, your left foot was on the last step of the bus and your right foot was on the metal grating just before the accident?

"A. I believe so.

"Q. *When you put your right foot down on the metal grating, did it appear to be slippery to you?*

"A. *No, I don't know. I don't remember. I don't think so.*

"Q. *Did you see ice on the grating before you put your right foot down?*

"A. *No.*" (Emphasis added.)

After plaintiff's fall, three passers-by helped him up off the ground, and he then entered the Port Authority and boarded a bus to New Jersey.[2]

The majority concedes that plaintiff has admitted that he could not see the ice until after his fall, even though he had

---

**2.** Although defendants do not raise this point, the photographs of the accident scene in the record (which plaintiff submitted) show that the metal grating did not extend all the way to the curb (meaning there was concrete between the curb and the beginning of the grating), and that the grating was divided into segments separated by concrete. Thus, it would appear that plaintiff should have been able to avoid walking on the metal grating upon alighting from the bus. The majority, while considering the photographs to the extent it deems them to support its position, ignores this aspect of what the photographs show.

been looking at the grating as he was stepping off the bus. Nonetheless, the majority disregards the inescapable implication of plaintiff's failure to see the ice while descending the steps—that the ice, if not visible from the steps, was not visible from the driver's seat, either. The majority does not identify any evidentiary basis in the record for inferring that the bus driver, from his perch in the driver's seat, should have seen ice on the grating that plaintiff failed to see as he stepped off the bus.[3]

The majority asserts that this action cannot be finally resolved in the absence of the testimony by the bus driver (whom defendants, in spite of reasonable efforts, have not been able to identify) as to what he was able to see when he stopped the bus. However, the driver's testimony is not needed to establish that he could not see the ice on the grating *from the driver's seat*, since plaintiff, by his own admission, could not see the ice *from the doorway of the bus*. Again, I fail to see how a person sitting in the driver's seat of a bus might have been able to see something on the ground in front of the bus door that plaintiff was unable to see while walking through that very door. The majority's approach is to feign ignorance of the location of the driver's seat on a bus in order to pretend that, without the driver's testimony, we have no idea whether or not he had a better view than plaintiff of the grating on which plaintiff was stepping. Thus, this case is being sent to trial to resolve a question that is already answered, as a matter of law, by uncontroverted evidence in the existing record.

In any event, it is clear from the existing record that plaintiff will not be able to sustain his burden of proving defendants' negligence at trial. Even if the majority were correct in its view that plaintiff's testimony does not disprove the driver's negligence, not even the majority goes so far as to contend that plaintiff's testimony constitutes affirmative proof of negligence on the part of the driver. Thus, plaintiff cannot prevail at trial based on his own testimony alone; he needs testimony from some other witness to establish that the driver actually saw, or reasonably should have seen, the ice on the grating, and nonetheless stopped the bus there, although safer alternative stop-

---

**3.** The majority does not solve its problem by referring to plaintiff's self-serving testimony that, *after his fall*, he allegedly saw apparently "clear" areas where he thought the driver should have stopped. Such testimony shows only what plaintiff thought he could see when he was already off the bus, on ground-level. This does not change the fact that the spot where the bus was stopped appeared clear to plaintiff before he fell.

ping points were available (*see Cuellar*, 5 AD3d at 531; *Diedrick*, 162 AD2d at 497).[4]

In opposing summary judgment, however, plaintiff did not muster a shred of evidence tending to show that the unidentified driver committed any such negligence. The absence from the record of sufficient evidence to support a verdict for plaintiff underscores the majority's error in reversing the grant of summary judgment.

I do not question the principle that a bus driver is obligated to use reasonable care to discharge passengers at a safe place. Thus, if a bus driver has a choice between letting passengers off either at a spot he can (with reasonable effort under the circumstances) see to be covered with ice or, alternatively, at a spot not covered with ice, the bus driver obviously should stop the bus at the latter spot, not the former, and the bus company may be held liable for the driver's failure to do so. Contrary to the majority's contentions, however, this is not such a case. The record shows that the ice on the grating was not visible to plaintiff until after he fell, and, therefore, the ice could not have been visible to the driver sitting at the wheel of the bus. The driver's duty of care did not extend so far as to require him to avoid stopping the bus at a spot where the ice was not visible to him. To hold otherwise is to make an insurer of the bus driver's employer.

The majority's determination to reinstate the complaint, notwithstanding the evidence exonerating the bus driver of negligence, and the absence of any evidence to support a finding that he was negligent, leads one to conclude that the majority does, in essence, view the transit authorities as insurers of the safety of persons alighting from buses. This is highlighted by the majority's assertion that we should not presume that the driver was concentrating on the traffic, rather than on the condition of the sidewalk surface, and that, even if the driver was keeping his eyes on the road (as drivers are usually expected to do), this is a matter "of questionable relevance to the

---

4. The majority seems to suggest that *Diedrick* does not stand for the proposition for which I cite it, namely, that a bus company cannot be held liable for injuries a passenger incurred in alighting from the bus unless the driver was aware, or reasonably should have been aware, of the hazardous condition that caused the injury. The majority's position is baseless. The *Diedrick* court gave two alternative grounds for its affirmance of the dismissal of the complaint, the first of which was that "there is nothing in the record to indicate that the Transit Authority was aware, or reasonably should have been aware, of any defect in the grassy area near the bus stop" where the plaintiff fell (162 AD2d at 497). The majority wrongly discusses the second, alternative ground for the decision as if it were the sole ground.

contested issues." I cannot believe that the majority would actually prefer that a driver *not* focus his attention on the surrounding traffic while operating a bus.[5]

The effect of defining safe bus-driving as negligence—which is what the majority is doing—is to make the transit authorities (and, through them, the fare-paying and taxpaying public) insurers against any injuries bus passengers may suffer as they alight. Because I am not aware of any act of the Legislature authorizing this Court to transform transit authorities into insurance companies, I respectfully dissent.

---

5. The majority seems to take the position that, if plaintiff prevails at trial, defendants will be held liable for the driver's failure to pay sufficient attention to sidewalk conditions while the bus was stopped, when the traffic did not require his undivided attention. I disagree. Obviously, a driver chooses a point at which to stop while the vehicle is still in motion. Thus, if defendants are to be held liable in this action, it is for the driver's conduct *while the bus was moving*, not while it was stationary. In any event, whenever the alleged negligence is said to have occurred, the record establishes, to reiterate, that plaintiff was far better situated to see the icy condition of the grating he was stepping on than was the driver; if plaintiff could not see the ice, neither could the driver.