■ FIRA KADYMIR, Respondent, v NEW YORK CITY TRANSIT AUTHORITY, Appellant. [865 NYS2d 269]—

In an action to recover damages for personal injuries, the defendant appeals from an order of the Supreme Court, Kings County (Hinds-Radix, J.), dated February 27, 2007, which denied those branches of its motion which were pursuant to CPLR 3211 (a) (7) to dismiss the complaint for failure to state a cause of action or pursuant to CPLR 3212 for summary judgment dismissing the complaint, with leave to renew upon completion of discovery.

Ordered that the order is reversed, on the law, with costs, and that branch of the defendant's motion which was pursuant to CPLR 3211 (a) (7) to dismiss the complaint for failure to state a cause of action is granted, and that branch of the motion which was pursuant to CPLR 3212 for summary judgment dismissing the complaint is denied as academic.

On the afternoon of August 14, 2003, after taking a recreational walk, the then-72-year old plaintiff used her MetroCard at the Kings Highway station owned and operated by the defendant, New York City Transit Authority (hereinafter the NYCTA), at about 4:00 P.M. and boarded a Brighton Beach-bound express "Q" subway train. The NYCTA is a common carrier that exercises both proprietary and governmental functions

(*see* Public Authorities Law § 1202 [2]; *Weiner v Metropolitan Transp. Auth.*, 55 NY2d 175, 181-182 [1982]; *Crosland v New York City Tr. Auth.*, 110 AD2d 148, 155 [1985], *affd* 68 NY2d 165 [1986]).

According to the plaintiff's testimony at a General Municipal Law § 50-h hearing, "[a]ll of the trains had lots of people[,]" but she found a seat. At approximately 4:10 P.M., while the train was between the Sheepshead Bay and Brighton Beach stations, the train's movement, air conditioning, and lights simultaneously shut down as a result of a blackout originating in Ohio that enveloped eight states and eastern Canada and affected millions of people.

The train did not move, "[e]verything was turned off[,]" and no announcements were made for approximately 40 minutes. At that time, NYCTA personnel directed all of the passengers to the first car of the train so they could disembark and walk to the Sheepshead Bay station, which was the nearest station. The plaintiff complied with the directive and exited the front door of the first car by climbing down a ladder with the assistance of NYCTA employees and officers of the New York City Police Department (hereinafter the NYPD). The plaintiff had no problems climbing down the ladder. The NYCTA personnel instructed the plaintiff to walk along the track bed to the Sheepshead Bay station. The plaintiff alleges that after taking 8 or 10 steps along the track bed, which was littered with debris and an oily substance, she slipped on the oily substance and fell, sustaining injuries. The plaintiff thereafter commenced this action against the NYCTA, asserting a single cause of action to recover damages for negligence.

After joinder of issue but before completion of discovery, the NYCTA moved pursuant to CPLR 3211 (a) (7) to dismiss the complaint for failure to state a cause of action or, pursuant to CPLR 3212 for summary judgment dismissing the complaint. The NYCTA argued, inter alia, that it owed no duty to the plaintiff and that, in any event, it was immune from liability for injuries that may have resulted from its employees' discretionary determination to evacuate the train by directing passengers to walk along the track bed to the Sheepshead Bay station. The Supreme Court denied the motion in its entirety, but granted the defendant leave to renew that branch of its motion which was for summary judgment dismissing the complaint upon the completion of discovery. We reverse.

In her sole cause of action, to recover damages for negligence, the plaintiff explicitly seeks to recover on the ground the NYCTA owed her a duty of reasonable care under the circum-

stances to provide a safe means of egress from its train (*see Bingham v New York City Tr. Auth.*, 8 NY3d 176, 180 [2007]; *Bethel v New York City Tr. Auth.*, 92 NY2d 348, 356 [1998]). However, reading the notice of claim and complaint together, the plaintiff's theory of negligence is also based on the NYCTA's alleged negligence in deciding to evacuate passengers from the subway train by directing them to walk along the track bed to the next station. Specifically, the plaintiff's notice of claim states that after the subway train "suddenly stopped[,] passengers were forced[ ] by employees of the [NYCTA] to exit the train in between stops along said train track." The complaint similarly alleges that after the subway train stopped, "the [NYCTA's] servants, agents, and/or employees removed passengers, including the Plaintiff, from the 'Q' train onto the elevated rails." The complaint also alleges that the NYCTA "was negligent [in] failing to properly assist and aid the Plaintiff after removing the Plaintiff from the train and placing her on the elevated train rails between the Brighton Beach station and the Sheepshead Bay station." Further, the affirmation of the plaintiff's counsel in opposition to the NYCTA's motion explains that the plaintiff was alleging not only that the NYCTA was "negligent in creating or permitting an oily substance to exist on the tracks" but "was negligent in directing the Plaintiff to exit the train and walk in the area w[h]ere the oily substance existed."

Governmental immunity arises "when the conduct complained of 'involves the exercise of professional judgment,' even if the judgment was poor" (*Kovit v Estate of Hallums,* 4 NY3d 499, 506 [2005], quoting *Kenavan v City of New York,* 70 NY2d 558, 569 [1987]; *see Lauer v City of New York,* 95 NY2d 95, 99 [2000]; *Abraham v City of New York,* 39 AD3d 21, 25 [2007]). Where, as here, the public entity serves a dual proprietary and governmental role, the analysis involves determining where along the spectrum of proprietary and governmental functions the defendant's alleged negligence falls into (*see Sebastian v State of New York,* 93 NY2d 790, 793-794 [1999]; *Miller v State of New York,* 62 NY2d 506, 512 [1984]). On the extreme end of the governmental function is the exercise of police and fire powers, while at the extreme end of the proprietary function is the exercise of maintenance and repair powers traditionally performed by private entities, such as a landlord (*see Sebastian v State of New York,* 93 NY2d at 793; *Clinger v New York City Tr. Auth.,* 85 NY2d 957, 959 [1995]; *Miller v State of New York,* 62 NY2d at 510, 512-513). To determine where along the continuum the alleged negligence lies, "[i]t is the specific act or omission out of which the injury is claimed to have arisen and

the capacity in which that act or failure to act occurred which governs liability, not whether the agency involved is engaged generally in proprietary activity or is in control of the location in which the injury occurred" (*Weiner v Metropolitan Tr. Auth.*, 55 NY2d at 182; *see Crosland v New York City Tr. Auth.*, 110 AD2d at 155).

Here, the plaintiff's alleged injury arose when the subway train, as a result of a massive regional blackout, lost all power and after 40 minutes, the NYCTA, apparently in conjunction with the NYPD, decided to evacuate the subway train by directing passengers, including the plaintiff, to disembark directly onto the track bed and walk to the next station. The plaintiff does not and cannot fault the NYCTA for the subway train stopping (*see Baptiste v New York City Tr. Auth.*, 28 AD3d 385 [2006]). Thus, although the plaintiff specifically alleges that the NYCTA's alleged negligent maintenance of the track bed caused her injuries, any alleged injuries she sustained actually arose from the NYCTA's discretionary decision to evacuate passengers from the subway train directly onto the track bed, not from its proprietary function in maintaining a track bed for passenger egress (*see Haddock v City of New York*, 75 NY2d 478, 484 [1990]). As such, it is not the NYCTA's maintenance of the track bed that is at issue, but its decision to evacuate the plaintiff onto the track bed.

Turning to whether immunity attaches to the facts at bar, accepting as true the facts alleged in the complaint and resolving all inferences in the parties' submissions in the plaintiff's favor (*see Cron v Hargro Fabrics*, 91 NY2d 362, 366 [1998]; *Arrington v New York Times Co.*, 55 NY2d 433, 442 [1982], *cert denied* 459 US 1146 [1983]), we find that the plaintiff has failed to state a cause of action against the NYCTA.

To avoid the attachment of governmental immunity, the plaintiff must show the existence of a special relationship with the public entity (*see Pelaez v Seide*, 2 NY3d 186, 199 n 8 [2004]). In light of the facts at bar, to demonstrate such a special relationship with the NYCTA, the plaintiff had to establish four elements: "(1) an assumption by a municipality, through promises or actions, of an affirmative duty to act on behalf of the injured party; (2) knowledge on the part of a municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking" (*Palaez v Seide*, 2 NY3d at 202; *see Kovit v Estate of Hallums*, 4 NY3d at 506-507; *Abraham v City of New York*, 39 AD3d at 26). The plaintiff failed to establish

the second element, as she did not show that the NYCTA had actual or constructive knowledge that she specifically required assistance in traversing the track bed such that the NYCTA's employees had knowledge that their inaction could lead to harm (*see Lazan v County of Suffolk*, 4 NY3d 499, 508 [2005]). Under the circumstances, we need not address the remaining elements.

In light of our determination, we need not address the parties' remaining contentions. Mastro, J.P., Ritter and McCarthy, JJ., concur.

Carni, J. (dissenting and voting to affirm the Supreme Court's order denying the defendant's motion, with the following memorandum): It is well settled that public entities remain immune from negligence claims arising out of the performance of their governmental functions unless the injured person establishes a special relationship with the entity which would create a specific duty to protect that individual, and the individual relied on the performance of that duty (*see Miller v State of New York*, 62 NY2d 506, 511 [1984]). "[However,] [i]n direct contrast to the rule of governmental immunity when the government's failure to provide a public service results in individual harm is the rule that when a government acts in a purely proprietary capacity, for example, as a landlord, medical care provider, or a common carrier, it is subject to the same principles of tort liability as a private individual or corporation. In other words, there is liability without need of proof of a special relationship when the government acts in its proprietary capacity" (15 NY Prac, New York Law of Torts § 17:45 [2007]).

Contrary to the majority's analysis, the plaintiff in this case, as in *Miller v State of New York* (62 NY2d 506 [1984]), is not urging recovery under the theory that the NYCTA was negligent in performing a governmental function. This is not a case which invokes or requires, in the first instance, the governmental immunity-special relationship analysis. Unlike many of the cases that involve this analytical pathway, this matter is not a police protection or allocation of police resources case (*see e.g. Weiner v Metropolitan Transp. Auth.*, 55 NY2d 175 [1982]).

Instead, in my view, this is a simple negligence case involving the NYCTA's negligent failure to provide the plaintiff with a safe and adequate means of egress from a train, obligated as it was to take such reasonable precautions as a common carrier for its passengers' safety (*see Crosland v New York City Tr. Auth.*, 110 AD2d 148 [1985], *affd* 68 NY2d 165 [1986]).

Accordingly, the plaintiff need not resort to attempting to establish a duty through a "special relationship." Instead, the NYCTA's duty already exists—a common carrier owes its pas-

sengers a duty of reasonable care under the circumstances to provide a safe means of egress for passengers to disembark from its train or bus (see *Bethel v New York City Tr. Auth.*, 92 NY2d 348 [1998] [NYCTA, as a common carrier, owes its passengers a duty of reasonable care under the circumstances]).

Specifically, on August 14, 2003 the plaintiff, a 72-year-old woman, used her MetroCard to pay the appropriate subway fare and boarded the NYCTA's "Q" subway train. At that point in time, the plaintiff was a passenger in a subway train operated by the NYCTA as a common carrier. Accordingly, the NYCTA owed the plaintiff a duty to stop at a place where she could safely disembark and leave the area without incurring a risk of injury (see *Miller v Fernan*, 73 NY2d 844, 846 [1988]; *Rios v City of New York*, 33 AD3d 780, 781 [2006]; *Archer v New York City Tr. Auth.*, 25 AD3d 351 [2006]; *Malawer v New York City Tr. Auth.*, 18 AD3d 293 [2005], *affd* 6 NY3d 800 [2006]; *Mompoint v New York City Tr. Auth.*, 8 AD3d 539 [2004]; PJI 2:166).

Thus, in *Dunham v City of New York* (262 AD2d 444 [1999]), this Court denied the NYCTA's motion for summary judgment and stated: "On March 20, 1995, the plaintiff was a passenger on a bus operated by the appellant, the New York City Transit Authority. When the bus stopped, the plaintiff, upon exiting, allegedly fell over a cracked, defective portion of the sidewalk in front of where she exited the bus. The Supreme Court properly denied the appellant's motion for summary judgment. There are issues of fact as to whether the plaintiff was provided with a safe place to alight and whether there was a safe path away from the bus (see *Miller v Fernan*, 73 NY2d 844, 846; cf. *Otonoga v City of New York*, 234 AD2d 592)."

In *Rios v City of New York* (33 AD3d 780, 781 [2006]), we recently stated: "A common carrier owes a duty to an alighting passenger to stop at a place where the passenger may safely disembark and leave the area (see e.g. *Miller v Fernan*, 73 NY2d 844, 846 [1988]). Thus, a bus company may be held liable for a passenger's injuries where such passenger is struck by a car upon crossing the street after having alighted from the bus at an unscheduled stop (see *Miller v Fernan*, [73 NY2d 844, 846 (1988)]), or where a defect in the condition of the ground in the immediate vicinity where a passenger alighted from the bus caused the passenger to trip and fall (see *Dunham v City of New York*, 262 AD2d 444 [1999]; *Blye v Manhattan & Bronx Surface Tr. Operating Auth.*, 124 AD2d 106 [1987], *affd* 72 NY2d 888 [1988]; *Bundy v City of New York*, 18 AD2d 799 [1963] [, *affd* 13 NY2d 1181 (1964)])."

Here, setting aside for a moment the reason why, there is no

dispute that the subway train made an unscheduled stop in between two subway stations. The plaintiff, as well as all other passengers, was directed by the NYCTA through a train-wide announcement to go to the first car and disembark from the train onto the elevated track area. At that point the plaintiff was further directed by NYCTA workers to proceed to walk along the tracks to the Sheepshead Bay platform. Eight to 10 steps later the plaintiff was caused to fall upon an accumulation of oil, garbage, stone, and other obstructions on the track area.

The record is clear that the police officers who were at the scene were members of the New York City Police Department—a legal entity distinct and wholly separate from the NYCTA. The NYCTA police force was dissolved in 1995. Indeed, the police aided report contained in the record, and which confirms the plaintiff's fall on the train track area, is issued by the "New York City Police Department." While the New York City Police Department might enjoy immunity for its allocation of police resources and the absence or presence of police officers at the scene, the New York City Police Department is not a common carrier and the City of New York is not a defendant. Thus, any analogy to or reliance upon those cases involving the allocation of police resources or providing police protection is, on this record, in my view wholly misplaced if applied to the NYCTA as a common carrier.

Thus, the question is whether the NYCTA, as a common carrier, breached its duty to the plaintiff to provide her with a safe place and pathway to disembark. Liability will rest upon a finding that the plaintiff, as a passenger, was required to negotiate a dangerous or defective path in order to leave the area. Whether a common carrier has breached its duty in this regard is generally a question of fact to be determined by the jury (*see Archer v New York City Tr. Auth.*, 25 AD3d 351 [2006]; *Malawer v New York City Tr. Auth.*, 18 AD3d 293 [2005], *affd* 6 NY3d 800 [2006]).

In my view, the circumstances presented here do not call into play any issues concerning governmental immunity, the special relationship analysis, or discretionary acts by NYCTA personnel. Thus, the complaint states a cause of action to recover damages for negligence. Moreover, there are triable issues of fact. Therefore, I respectfully dissent.

Insofar as the majority's discussion of municipal immunity and "the exercise of professional judgment" is concerned, I would initially note that none of the cases relied upon by the majority (cited in the appellant's brief) involves a common carrier's duty to a disembarking passenger and are factually and

analytically inapplicable (*see Kovit v Estate of Hallums,* 4 NY3d 499 [2005] [police officers involved in highway and traffic patrol]; *Lauer v City of New York,* 95 NY2d 95 [2000] [City medical examiner's erroneous autopsy conclusion]; *Kenavan v City of New York,* 70 NY2d 558 [1987] [no special relationship between City and firefighters injured during extinguishing of fire ignited in abandoned vehicle which City failed to timely remove from roadway]; *Abraham v City of New York,* 39 AD3d 21 [2007] [City Health Department failed to investigate tuberculosis outbreak at a school]).

The majority recognizes that the NYCTA, as a common carrier, owed the plaintiff, as a passenger, a duty of care. This acknowledgment, on its face, eliminates the relevancy or necessity of addressing the governmental immunity or "special relationship" analysis. The "special relationship" analysis is a means by which to establish a duty when, due to governmental immunity, one does not yet exist. However, once one accepts that the plaintiff and the NYCTA were in a passenger-common carrier relationship, a duty of care exists ab initio as a matter of law and it is wholly unnecessary and inappropriate to engage in the "special relationship" analysis (*see Bethel v New York City Tr. Auth.,* 92 NY2d 348 [1998]; *Rios v City of New York,* 33 AD3d 780 [2006]; *Dunham v City of New York,* 262 AD2d 444 [1999] [issues of fact as to whether the plaintiff was provided with a safe place to alight and whether there was a safe path away from the bus precluded summary judgment]). These are separate, mutually-exclusive analytical pathways with no overlap or common elements.

Notably, the majority opinion cites *Bingham v New York City Tr. Auth.* (8 NY3d 176 [2007]), in recognition of the NYCTA's duty to exercise reasonable care in maintaining a safe means of ingress and egress to a subway. *Bingham* involves a passenger who fell on a stairway used as a means of ingress to and egress from the subway. There is no discussion of governmental immunity or special relationship in *Bingham* because, as a common carrier, the NYCTA owed the plaintiff passenger a duty of care which transcended such immunity. Indeed, in *Bingham,* the Court of Appeals affirmed a jury verdict for the plaintiff and held: "So imperative is the duty to provide a safe means of access to and from the subway that such duty may not be delegated to another" (*Bingham v New York City Tr. Auth.,* 8 NY3d at 181).

The majority's analysis fails to explain how the NYCTA's status, and concomitant duties as a common carrier, ceased to exist when the train came to a stop. In my view, the NYCTA's

duty as a common carrier continues beyond the stop of the train until the passengers are provided with a safe means of egress from the train. I cannot accept, as the majority does, that the plaintiff was entitled to a safe means of disembarking the train when she first boarded the fully operational train and paid her fare, but that upon the train stopping in between stations—for whatever reason—the NYCTA's duty to provide a safe means of disembarking vanished.

The proposition that the 72-year-old plaintiff was required to demonstrate the defendant's knowledge that she specifically required assistance in traversing the track bed demonstrates the misapplication of the governmental immunity and special relationship concepts of this case. Initially, *Kovit v Estate of Hallums* (4 NY3d 499 [2005]), relied upon by the majority, does not involve a common carrier with an existing duty of care. *Kovit* involves police officers involved in highway and traffic patrol. It is well settled that in police patrol and law enforcement situations municipalities generally enjoy immunity from liability for discretionary activities undertaken through their agents, except when plaintiffs establish a "special relationship" with the municipality (*Kovit v Estate of Hallums*, 4 NY3d at 505). However, the need for special assistance is an element of the special relationship analysis which does not apply in the common carrier duty of reasonable care to a passenger analysis at hand.

In summary, I cannot join in the majority's liability analysis in that it begins with the evacuation of the train at approximately 4:45 P.M. and does not recognize the continuing duties and obligations accepted by the NYCTA at the inception of the common carrier relationship created 45 minutes earlier when the plaintiff boarded the train at 4:00 P.M.

Lastly, while there is no dispute that the subway train was caused to stop in between subway stations because of a power failure, such circumstance alone does not warrant the dismissal of the plaintiff's action as a matter of law. There are many reasons why a subway train would be required to stop between stations—a blackout among them—as well as routine mechanical breakdowns, accidents, and other causes. The question is whether such a stop was foreseeable—not its cause—and whether the NYCTA acted reasonably, vis-à-vis its passengers, in response thereto. I respectfully submit that the point is not whether the plaintiff can fault the NYCTA for the subway train stopping—and the plaintiff does not do so.

Encountering an emergency does not completely absolve one from liability; it simply requires that one's conduct be measured

against that of a reasonable person confronted with similar circumstances in a similar time frame within which to act (see 1 NY PJI3d 2:14, at 238 [2008]). Except in the most egregious circumstances, it is normally left to the trier of fact to determine if a particular situation rises to the level of an emergency. Moreover, an emergency charge should not be given to the jury if the emergency is one which the defendant should have anticipated and been prepared to meet (see 1 NY PJI3d 2:14, at 238-239).

In this case, the record demonstrates that the NYCTA had at least 40 minutes from the onset of the power failure to formulate and execute a plan for the safe disembarking of its passengers. While the NYCTA's counsel alleges that the passengers were suffering in the "sweltering heat," he wasn't on the train. The plaintiff was on the train and she described the weather as "perfect." Indeed, the NYCTA failed to demonstrate on this record that its directions to its passengers to disembark onto the tracks was necessitated by any immediate threat to passenger safety, the absence of time to deliberate and consider a course of action, or whether directing the plaintiff and other passengers to walk along the subway tracks was a reasonable one given the time frame within which to react (cf. Bello v Transit Auth. of N.Y. City, 12 AD3d 58, 60-61 [2004] [emergency stop injuring bus passenger made only after distressed and panicking passengers urgently told the driver that a man had left a bomb on a bus]). Indeed, the NYCTA did not demonstrate that it had any plan for passenger safety in the event of an unscheduled stop between stations.

Here, the NYCTA made no competent evidentiary submission in an attempt to demonstrate that it did not have adequate time to formulate a reasonably safe plan to disembark its passengers or that the decision to direct the passengers to walk on the track area, given its obvious condition, was a reasonable one under all the circumstances.

Accordingly, for all the foregoing reasons I dissent and would affirm the Supreme Court's order.