■ WILLIAM HEERAN, Individually and on Behalf of HARBOR LIGHT ENTERPRISES CORP. and Another, et al., Respondents, v LONG ISLAND POWER AUTHORITY (LIPA) et al., Appellants, et al., Defendants. [36 NYS3d 165]—

In an action, inter alia, to recover damages for negligence, the defendant Long Island Power Authority (LIPA) appeals, and the defendant National Grid Electric Services, LLC, incorrectly sued herein as Keyspan Electric Services, LLC, separately appeals, from an order of the Supreme Court, Queens County (Siegal, J.), entered July 9, 2014, which denied their joint motion pursuant to CPLR 3211 (a) (7) to dismiss the amended complaint insofar as asserted against them.

Ordered that the order is affirmed, with costs.

The plaintiffs, who sustained property damage in the wake of Hurricane Sandy, seek to hold the defendants responsible in negligence. According to the amended complaint, the plaintiffs were owners of real and personal property on the Rockaway Peninsula in Queens. They also were customers of the defend-

ants Long Island Power Authority (LIPA), a public authority (*see* Public Authorities Law § 1020 *et seq.*), and National Grid Electric Services, LLC (hereinafter NGES), incorrectly sued herein as Keyspan Electric Services, LLC, a private entity. NGES operated LIPA's electrical transmission and distribution system under a management services agreement.

On October 26, 2012, as Hurricane Sandy approached, the Governor of the State of New York declared a "State Disaster Emergency" (hereinafter the Declaration of Emergency). Two days later, the Mayor of the City of New York issued a "Proclamation of a State of Emergency and Evacuation Order" (hereinafter the Evacuation Order) with respect to the evacuation of "Zone A," which included the Rockaway Peninsula. The plaintiffs allege that LIPA and NGES (hereinafter together the appellants) should have foreseen, among other things, that salt water from the storm surge would come into contact with electrical transmission lines, that fires would result if the electrical transmission lines were live, and that the fires would cause property damage. The plaintiffs allege that salt water from the storm surge indeed came into contact with live transmission lines, that fires resulted, and that the fires damaged their property. The plaintiffs allege that in light of what was foreseeable, the appellants were negligent in their preparation for and reaction to the hurricane, including, in particular, their failure to de-energize the Rockaway Peninsula.

The appellants jointly moved pursuant to CPLR 3211 (a) (7) to dismiss the amended complaint insofar as asserted against them. They contended that LIPA is immune from liability under the doctrine of governmental function immunity because its response to the hurricane—most specifically its decision not to de-energize the Rockaway Peninsula after the Declaration of Emergency and the Evacuation Order were issued—amounted to the performance of a discretionary governmental action. They further insisted that NGES likewise was entitled to the benefit of that doctrine because, under NGES's agreement with LIPA, NGES was providing an essential governmental function on behalf of LIPA. The Supreme Court denied the motion. LIPA and NGES appeal.

In determining a motion to dismiss a complaint for failure to state a cause of action (*see* CPLR 3211 [a] [7]), the court must read the complaint liberally and assume that the plaintiffs' allegations are true. If the allegations, as supplemented by any affidavits, fit within any cognizable legal theory, the court must deny the motion to dismiss (*see Leon v Martinez*, 84 NY2d 83, 87 [1994]; *Matter of Long Is. Power Auth. Hurricane Sandy*

*Litig.*, 134 AD3d 1119, 1120 [2015]; *East Hampton Union Free School Dist. v Sandpebble Bldrs., Inc.*, 66 AD3d 122, 125 [2009], *affd* 16 NY3d 775 [2011]; *Breytman v Olinville Realty, LLC*, 54 AD3d 703, 703-704 [2008]).

Governmental entities perform a variety of functions. Some of these functions are purely proprietary, others are purely governmental, and others have characteristics of both. The distinction between proprietary and governmental functions is important because the governmental function immunity doctrine applies, as its name suggests, only to the actions of a governmental entity that are properly categorized as governmental functions (*see Sebastian v State of New York*, 93 NY2d 790, 793 [1999]; *Granata v City of White Plains*, 120 AD3d 1187, 1188 [2014]; *Kochanski v City of New York*, 76 AD3d 1050, 1051 [2010]). Governmental entities acting in furtherance of a proprietary function will be subject to liability under ordinary principles of tort law (*see Miller v State of New York*, 62 NY2d 506, 511 [1984]).

"[Q]uintessential governmental functions" include police and fire protection; these functions are "acts . . . 'undertaken for the protection and safety of the public pursuant to the general police powers' " (*Applewhite v Accuhealth, Inc.*, 21 NY3d 420, 425 [2013], quoting *Sebastian v State of New York*, 93 NY2d at 793). By contrast, a "government entity performs a purely proprietary role when its 'activities essentially substitute for or supplement traditionally private enterprises' " (*Applewhite v Accuhealth, Inc.*, 21 NY3d at 425, quoting *Sebastian v State of New York*, 93 NY2d at 793; *see Wittorf v City of New York*, 23 NY3d 473, 479 [2014]). Proprietary functions include, for example, the maintenance of roads and highways in a reasonably safe condition (*see Wittorf v City of New York*, 23 NY3d at 480).

In New York, electric utilities have been "traditionally private enterprises" (*Sebastian v State of New York*, 93 NY2d at 793 [internal quotation marks omitted]). Moreover, the legislature enacted the Long Island Power Authority Act (Public Authorities Law § 1020 *et seq.*) for the express purpose of "replacing" the Long Island Lighting Company (hereinafter LILCO), a private utility, with LIPA (Public Authorities Law § 1020-a; *see* Public Authorities Law § 1020-g [n]). The legislature cited a "lack of confidence" in LILCO (Public Authorities Law § 1020-a). It also expressed its expectation that LIPA would do a better job than LILCO of providing electricity: "the replacement of such investor owned utilities by [LIPA] will result in an improved system and reduction of

future costs and a safer, more efficient, reliable and economical supply of electric energy" (Public Authorities Law § 1020-a). Thus, the legislature clearly intended that LIPA "substitute for [a] traditionally private enterprise[ ]" in the performance of a proprietary function (*Sebastian v State of New York*, 93 NY2d at 793 [internal quotation marks omitted]).

We conclude that under the analysis long utilized by the Court of Appeals (*see Applewhite v Accuhealth, Inc.*, 21 NY3d at 425; *Matter of World Trade Ctr. Bombing Litig.*, 17 NY3d 428, 446-447 [2011]; *Sebastian v State of New York*, 93 NY2d at 793; *Miller v State of New York*, 62 NY2d at 511-512; *Riss v City of New York*, 22 NY2d 579, 581-582 [1968]), the provision of electricity is properly categorized as a proprietary function. The provision of electricity has traditionally been a private enterprise in this state, and the legislature clearly created LIPA as a public authority to substitute for a private enterprise (*see Applewhite v Accuhealth, Inc.*, 21 NY3d at 425; *Sebastian v State of New York*, 93 NY2d at 793).

Our dissenting colleague posits that a "governmental entity's preparation for a natural disaster or for some other external emergency, and its response during such an event, are generally deemed to be governmental functions." The underlying premise of this assertion is that the governmental entity is acting in a dual role. When the entity is acting in a dual role, its activities may implicate a "continuum of responsibility" ranging from the most purely proprietary to the most complex governmental (*Miller v State of New York*, 62 NY2d 506, 511 [1984]; *see Marilyn S. v City of New York*, 134 AD2d 583, 584 [1987], *affd for reasons stated below* 73 NY2d 910 [1989]). In those situations, "[i]t is the specific act or omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred which governs liability" (*Weiner v Metropolitan Transp. Auth.*, 55 NY2d 175, 182 [1982]; *see Marilyn S. v City of New York*, 134 AD2d at 584). Our colleague concludes that the appellants' response to Hurricane Sandy was more akin to the governmental function of policing than it was to the ordinary process of running an electrical utility.

We reject the premise that the appellants were acting in a dual role in operating as an electrical utility. One example of such a dual role is a governmental entity's ownership of property. When a governmental entity acts as a landlord, it generally has the same tort liability as a private landlord (*see Miller v State of New York*, 62 NY2d at 511; *Granata v City of White Plains*, 120 AD3d at 1188-1189). Thus, for example, it

has a duty, like any other landlord, to maintain its property in a reasonably safe condition (*see Matter of World Trade Ctr. Bombing Litig.*, 17 NY3d at 446-447; *Miller v State of New York*, 62 NY2d at 511). A governmental property owner may thus be responsible for providing adequate security in the form of working doorlocks or security cameras (*see Miller v State of New York*, 62 NY2d at 513-514; *Granata v City of White Plains*, 120 AD3d at 1188-1189).

· On the other hand, a governmental property owner's decisions as to the deployment of police and its response to terrorist threats is governmental, rather than proprietary (*see Matter of World Trade Ctr. Bombing Litig.*, 17 NY3d at 447-448; *Miller v State of New York*, 62 NY2d at 512; *Salone v Town of Hempstead*, 91 AD3d 746, 747 [2012]; *Pugliese v City of New York*, 115 AD2d 465, 465 [1985]). In *Matter of World Trade Ctr. Bombing Litig.*, for example, the Court of Appeals distinguished the security obligations of every landowner from the responsibility of the Port Authority of New York and New Jersey (hereinafter the Port Authority) as a governmental entity: "unlike the safety precautions required of every reasonable landowner, the Port Authority's security operations featured policy-based decision-making involving due consideration of pertinent factors such as the risk of harm, and the costs and benefits of pursuing a particular allocation of resources. As a result, the Port Authority placed police resources in priority areas deemed more susceptible to attack—i.e., the high-risk plaza and concourse rather than the low-risk parking garage" (*Matter of World Trade Ctr. Bombing Litig.*, 17 NY3d at 449). Thus, the Port Authority's "security" obligations with respect to the World Trade Center concerned dual roles: proprietary responsibilities as the owner of property, and governmental responsibility to the public at large in policing functions. In short, the Port Authority's responsibility in preparing for and responding to a terrorist threat is very different from the responsibility of an ordinary property owner to keep property reasonably safe.

By contrast, the functions of electric utilities in the ordinary course of providing electricity and in responding adequately to a hurricane are both part of the proprietary core functions of their business. True, here, the appellants' actions, because of the size of LIPA's customer base, affected many people and many businesses. True, too, LIPA's response to the hurricane may have involved complex considerations. But every private electric utility in the region faced the same hurricane. For example, Consolidated Edison, Inc. (hereinafter Con Ed), which

is the main provider of electricity in the City of New York, preemptively de-energized lower Manhattan and certain parts of Brooklyn, including neighborhoods across the water and immediately north of the Rockaway Peninsula, which were areas threatened with flooding, as a means of reducing likely damage to Con Ed's and its customers' equipment. It is not simply the size of the task that determines whether an action is governmental or proprietary. The determination must also consider the nature of the responsibility. Simply put, the appellants have not established that their decision not to de-energize the Rockaway Peninsula involved governmental function powers. Accordingly, we disagree that the magnitude of Hurricane Sandy itself shielded the appellants from having to answer in tort for deficiencies in their preparation and response.

LIPA relies on legislation declaring that it exercises "essential governmental and public powers" (Public Authorities Law § 1020-c) and "an essential governmental function" (Public Authorities Law § 1020-p [1]). That designation, however, is present in many laws creating public authorities, many of which may be regarded as engaging in proprietary activities in furtherance of their core purpose (see e.g. Public Authorities Law §§ 902 [7] [Long Island Market Authority]; 1264 [2] [Metropolitan Transportation Authority]; 1427 [2] [White Plains Parking Authority]; 1942 [5] [Upper Mohawk Valley Memorial Auditorium Authority]; 2052-c [5] [Oneida County Sports Facility Authority]; 2502 [New York City Sports Authority], 2751 [6] [Monroe County Airport Authority]; 3301 [5] [Westchester County Health Care Corporation]; 3551 [8] [Roswell Park Cancer Institute Corporation]). The legislative declaration that a governmental entity is engaging in "an essential government function" is relevant in other legal contexts (see e.g. Matter of Long Is. Power Auth. Hurricane Sandy Litig., 134 AD3d at 1121), but it is not determinative with respect to the applicability of the governmental immunity doctrine to shield the entity from tort liability.

Finally, since NGES's claim of governmental immunity presupposes that LIPA is entitled to governmental immunity, our conclusion that LIPA is not entitled to immunity necessarily rejects NGES's claim of immunity as well.

The appellants' remaining contentions are without merit or need not be addressed in light of our determination.

Accordingly, the Supreme Court properly denied the joint motion of LIPA and NGES pursuant to CPLR 3211 (a) (7) to dismiss the amended complaint insofar as asserted against them. Balkin, J.P., Austin and Hinds-Radix, JJ., concur.

Miller, J., dissents, and votes to reverse the order appealed from, on the law, and grant the joint motion of the defendants Long Island Power Authority (LIPA) and National Grid Electric Services, LLC, incorrectly sued herein as Keyspan Electric Services, LLC, pursuant to CPLR 3211 (a) (7) to dismiss the amended complaint insofar as asserted against them, with the following memorandum: When properly invoked, the defense of governmental immunity shields a public entity from liability for its negligence. Although the application of this doctrine may yield harsh results, the courts of this state are not vested with the discretionary authority to pick and choose when to apply it. Rather, we are bound to apply governmental immunity in accordance with the legal principles set forth by the Court of Appeals. In this case, the Supreme Court applied the law of governmental immunity in a manner that conflicts with those precedents. Accordingly, I vote to reverse the order of the Supreme Court, and I must respectfully dissent from my colleagues' determination.

The plaintiffs were owners of real and personal property located on the Rockaway Peninsula in Queens. The plaintiffs commenced this action against, among others, the Long Island Power Authority (LIPA) and National Grid Electric Services, LLC, incorrectly sued herein as Keyspan Electric Services, LLC (hereinafter NGES) to recover damages for, inter alia, negligence.

The amended complaint alleged that LIPA was "a non-profit municipal electric provider" that owned and operated an electric transmission and distribution system serving customers on the Rockaway Peninsula, including the plaintiffs. The amended complaint alleged that NGES was a private entity that had contracted with LIPA to operate LIPA's electrical system.

The amended complaint alleged that in October 2012, a storm system identified as Hurricane Sandy began to move towards the New York City metropolitan area. The storm system became a Category One hurricane on October 24, 2012, and strengthened to a Category Two hurricane at its peak intensity. As the storm system made its way up the Atlantic coastline, it grew in size to nearly 2,000 miles across, and the National Weather Service issued high wind and flood watches for New Jersey, the City of New York, and Long Island.

The amended complaint alleged that on October 26, 2012, Governor Andrew Cuomo declared a state of emergency for all of New York's 62 counties in preparation for the impact of the hurricane. On October 28, 2012, the City of New York issued "a

Mandatory Evacuation Order for the Rockaway Peninsula." On October 29, 2012, Hurricane Sandy "intensified," and that evening and "through the night," the "storm surge created flooding [that] devastat[ed] many areas within the City of New York, . . . including the Rockaway Peninsula." Some of the flood waters came into contact with electrical transmission lines causing "electrical arcing." This electrical arcing allegedly generated heat that resulted in fires that ultimately damaged real and personal property owned by the plaintiffs.

The amended complaint alleged that LIPA and NGES "had a duty to maintain the electric transmission and distribution system . . . in a reasonably safe and suitable condition." The amended complaint also alleged that LIPA and NGES had "the duty . . . to . . . ensure the safety . . . of the property of the general public and . . . the property of those who were supplied electricity by . . . LIPA." The amended complaint alleged that LIPA and NGES "were negligent in their duty to maintain their electrical lines in a reasonably safe condition." More particularly, the plaintiffs asserted that LIPA and NGES were negligent in failing to de-energize the Rockaway Peninsula after the Mandatory Evacuation Order was issued since "it was foreseeable that failing to de-energize would cause fire and electrical hazards posed by wiring and circuits coming into contact with flood water." The plaintiffs also asserted that LIPA and NGES were negligent in failing to "de-energize or repair arcing and downed electrical lines" within a reasonable time after it received notice that such conditions had arisen during the course of the storm. The plaintiffs contended that, in light of the alleged negligence, they were entitled to recover from LIPA and NGES the value of property that had been damaged during the course of the storm.

LIPA and NGES (hereinafter together the moving defendants) jointly moved pursuant to CPLR 3211 (a) (7) to dismiss the amended complaint insofar as asserted against them. They argued that they were entitled to governmental immunity since they were performing a governmental function in determining how to prepare for, and respond to, the emergency situation that was created by the unprecedented storm.

The plaintiffs opposed the motion, arguing, inter alia, that the defense of governmental immunity was not applicable in this case. In this regard, the plaintiffs contended that the operation of an electrical utility was "a historically proprietary function," and that the moving defendants "at all times . . . acted as a utility and that their functioning was proprietary rather than governmental." The plaintiffs also contended that,

even if LIPA was entitled to governmental immunity, NGES could not assert such a defense since it was a private, for-profit corporation, not a governmental entity.

In the order appealed from, the Supreme Court denied the moving defendants' motion. The court stated: "[T]he evidence before this Court shows that, traditionally, electricity in New York has been provided by private entities, with public entities like LIPA being the exception rather than the rule." The court determined that "providing electricity to consumers [was] a proprietary act because electricity has traditionally been supplied by the private sector." Accordingly, the court concluded that since LIPA and NGES were engaged in the proprietary act of transmitting electricity, they were not entitled to assert the defense of governmental immunity. The court also concluded that NGES was unable to assert governmental immunity for the additional reason that "private contractors that perform work for government entities are liable for their own negligence" and "may not use governmental immunity as a defense to a negligence claim."

The moving defendants appeal from the Supreme Court's order. In my view, the court erred as a matter of law in the way it applied the principles of governmental immunity to the facts of this case, and the order should be reversed.

The Court of Appeals has stated that "[a]lthough the State long ago waived sovereign immunity on behalf of itself and its municipal subdivisions, the common-law doctrine of governmental immunity continues to shield public entities from liability for discretionary actions taken during the performance of governmental functions" (*Valdez v City of New York*, 18 NY3d 69, 75-76 [2011]; *see Haddock v City of New York*, 75 NY2d 478, 484 [1990]). "This limitation on liability reflects separation of powers principles and is intended to ensure that public servants are free to exercise their decision-making authority without interference from the courts" (*Valdez v City of New York*, 18 NY3d at 76). The doctrine of governmental immunity thus "reflects a value judgment that—despite injury to a member of the public—the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury" (*Haddock v City of New York*, 75 NY2d at 484; *see Mon v City of New York*, 78 NY2d 309, 313 [1991]).

The Court of Appeals has set forth the framework to be employed when applying the doctrine of governmental im-

munity to a negligence action against a governmental entity (*see Wittorf v City of New York*, 23 NY3d 473, 478-479 [2014]; *Applewhite v Accuhealth, Inc.*, 21 NY3d 420, 425-426 [2013]). "[T]he first issue for a court to decide is whether the [public] entity was engaged in a proprietary function or acted in a governmental capacity at the time the claim arose" (*Applewhite v Accuhealth, Inc.*, 21 NY3d at 425; *see Wittorf v City of New York*, 23 NY3d at 478-479). If the negligence claim arises out of the performance of a governmental function, the public entity will be immune from liability unless the injured person establishes a special relationship with the entity (*see Miller v State of New York*, 62 NY2d 506, 510 [1984]). On the other hand, "[i]f the [public entity's] actions fall in the proprietary realm, it is subject to suit under the ordinary rules of negligence applicable to nongovernmental parties" (*Applewhite v Accuhealth, Inc.*, 21 NY3d at 425; *see Wittorf v City of New York*, 23 NY3d at 478-479).

A governmental entity performs a purely proprietary role when its "activities essentially substitute for or supplement traditionally private enterprises" (*Sebastian v State of New York*, 93 NY2d 790, 793 [1999] [internal quotation marks omitted]; *see Applewhite v Accuhealth, Inc.*, 21 NY3d at 425). For example, "[o]wnership and care relating to buildings with tenants has traditionally been carried on through private enterprise, specifically by landlords and thus constitutes a proprietary function when performed by the State" (*Miller v State of New York*, 62 NY2d at 513). The Court of Appeals has also recognized that "a municipality has a proprietary duty to keep its roads and highways in a reasonably safe condition" (*Wittorf v City of New York*, 23 NY3d at 480).

In contrast, a governmental entity will be deemed to have been engaged in a governmental function when its acts are "undertaken for the protection and safety of the public" (*Sebastian v State of New York*, 93 NY2d at 793 [internal quotation marks omitted]; *see Wittorf v City of New York*, 23 NY3d at 479; *Applewhite v Accuhealth, Inc.*, 21 NY3d at 425). "Police and fire protection are examples of long-recognized, quintessential governmental functions" (*Applewhite v Accuhealth, Inc.*, 21 NY3d at 425). As such, the Court of Appeals has held that "a municipal emergency response system . . . should be viewed as 'a classic governmental, rather than proprietary, function'" (*id.* at 430, quoting *Valdez v City of New York*, 18 NY3d at 75).

In considering whether the functions of a public entity are proprietary or governmental in nature, the Court of Appeals has eschewed the application of a rigid dichotomy in favor of "a

continuum of responsibility to individuals and society deriving from its governmental and proprietary functions" (*Miller v State of New York*, 62 NY2d at 511-512). This "metaphorical continuum begins at one end with the purest proprietary matters and 'extends gradually out to more complex measures of safety and security for a greater area and populace, whereupon the actions increasingly, and at a certain point only, involve governmental functions' " (*Sebastian v State of New York*, 93 NY2d at 793, quoting *Miller v State of New York*, 62 NY2d at 512).

In this case, there is little difficulty in reaching the conclusion that the provision of electricity has traditionally been a proprietary enterprise undertaken by private entities (*see generally* Prosser & Keeton, Torts § 131 at 1053 [5th ed 1984]). The case law of this state is replete with instances where a private electric company has been subject to liability under ordinary rules of negligence (*see e.g. Miner v Long Is. Light. Co.*, 40 NY2d 372 [1976]; *Braun v Buffalo Gen. Elec. Co.*, 200 NY 484 [1911]; *Ward v Atlantic & Pac. Tel. Co.*, 71 NY 81 [1877]). As the plaintiffs correctly contend, New York courts have long recognized that "an electric power company has the duty to use that degree of care which is reasonably necessary to prevent persons from coming into contact with its transmission lines and to prevent the dangerous escape of electricity therefrom" (PJI 2:195; *see Miner v Long Is. Light. Co.*, 40 NY2d 372 [1976]; *Braun v Buffalo Gen. Elec. Co.*, 200 NY 484 [1911]; *Ward v Atlantic & Pac. Tel. Co.*, 71 NY 81 [1877]).

However, the fact that the moving defendants were generally engaged in a traditionally proprietary endeavor does not conclude the analysis. The Court of Appeals has recognized that the varying nature of activities engaged in by public entities "may sometimes partake of both proprietary and governmental aspects" (*Sebastian v State of New York*, 93 NY2d at 793), and that such entities may sometimes perform a "dual role" that involves the exercise of both proprietary and governmental functions (*Miller v State of New York*, 62 NY2d at 511).

Accordingly, the Court of Appeals has repeatedly stressed that "in light of the fact that the varied functions of a governmental entity can be interspersed with both governmental and proprietary elements, the determination of the primary capacity under which a governmental agency was acting turns solely on the acts or omissions claimed to have caused the injury" (*Matter of World Trade Ctr. Bombing Litig.*, 17 NY3d 428, 447 [2011]; *see Wittorf v City of New York*, 23 NY3d at 479;

*Sebastian v State of New York*, 93 NY2d at 794; *Miller v State of New York*, 62 NY2d at 511; *Weiner v Metropolitan Transp. Auth.*, 55 NY2d 175, 182 [1982]). In other words, "[i]t is the specific act or omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred which governs liability, not whether the agency involved is engaged generally in proprietary activity or is in control of the location in which the injury occurred" (*Weiner v Metropolitan Transp. Auth.*, 55 NY2d at 182; *see Wittorf v City of New York*, 23 NY3d at 479; *Matter of World Trade Ctr. Bombing Litig.*, 17 NY3d at 447; *Sebastian v State of New York*, 93 NY2d at 794; *Miller v State of New York*, 62 NY2d at 511).

Here, although the moving defendants were "engaged generally in proprietary activity" as providers of electrical power (*Weiner v Metropolitan Transp. Auth.*, 55 NY2d at 182), the gravamen of the amended complaint does not relate to those general operations. The amended complaint does not allege that the electric transmission and distribution system was in disrepair prior to the onset of Hurricane Sandy, or that it was not "strong enough to withstand such violent storms as may be reasonably expected" (*Ward v Atlantic & Pac. Tel. Co.*, 71 NY at 85). Nor does the amended complaint allege that the transmission lines were negligently located in dangerous proximity to water or to human activity, or that they were negligently constructed such that they were unreasonably susceptible to water damage (*cf. Miner v Long Is. Light. Co.*, 40 NY2d 372 [1976]). The amended complaint does not take issue with the condition of the electric transmission and distribution system prior to Hurricane Sandy or otherwise allege that, in the absence of the storm, the system was operated in a manner constituting negligence (*cf. Braun v Buffalo Gen. Elec. Co.*, 200 NY 484 [1911]; *Flex-O-Vit USA v Niagara Mohawk Power Corp.*, 292 AD2d 764 [2002]).

As the amended complaint reflects, the plaintiffs do not take the position that the electric transmission and distribution system was inherently dangerous. Instead, the plaintiffs claim that the system was rendered dangerous by the presence of an external threat. Accordingly, "the specific act or omission out of which the injury is claimed to have arisen" is not related to the normal day-to-day operation of the system, but rather, the failure to deviate from such normal operations given the extraordinary circumstances occasioned by Hurricane Sandy (*Weiner v Metropolitan Transp. Auth.*, 55 NY2d at 182).

A governmental entity's preparation for a natural disaster or for some other external emergency, and its response during

such an event, are generally deemed to be governmental functions (*see Applewhite v Accuhealth, Inc.*, 21 NY3d at 428-429; *Matter of World Trade Ctr. Bombing Litig.*, 17 NY3d at 447; *Laratro v City of New York*, 8 NY3d 79, 80 [2006]; *Cockburn v City of New York*, 129 AD3d 895, 897 [2015]; *Estate of Gail Radvin v City of New York*, 119 AD3d 730, 733 [2014]; *Freeman v City of New York*, 111 AD3d 780, 782 [2013]; *Stathakos v Metropolitan Tr. Auth. Long Is. R.R.*, 109 AD3d 979, 980-981 [2013]; *Kadymir v New York City Tr. Auth.*, 55 AD3d 549, 552 [2008]). Such functions are unquestionably "undertaken for the protection and safety of the ·public" (*Balsam v Delma Eng'g Corp.*, 90 NY2d 966, 968 [1997]; *see Applewhite v Accuhealth, Inc.*, 21 NY3d at 430), and implicate discretionary policy decisions regarding the management and prioritization of the multifaceted risks posed by the external hazard, along with the utilization of the finite resources available to address such threats to public safety (*see Matter of World Trade Ctr. Bombing Litig.*, 17 NY3d at 448-449; *Stathakos v Metropolitan Tr. Auth. Long Is. R.R.*, 109 AD3d at 980-981; *Kadymir v New York City Tr. Auth.*, 55 AD3d at 552; *see also Balsam v Delma Eng'g Corp.*, 90 NY2d at 968; *Clinger v New York City Tr. Auth.*, 85 NY2d 957, 959 [1995]; *Bonner v City of New York*, 73 NY2d 930, 932 [1989]; *Weiner v Metropolitan Transp. Auth.*, 55 NY2d at 182).

Moreover, as the Court of Appeals has repeatedly recognized, " 'complex measures of safety and security for a greater area and populace' is more indicative of the performance of a governmental function" (*Matter of World Trade Ctr. Bombing Litig.*, 17 NY3d at 450, quoting *Miller v State of New York*, 62 NY2d at 512). Here, given the allegations in the amended complaint, it is evident that the specific acts or omissions comprising the plaintiffs' negligence claim necessarily affected a large geographical area as well as the health and safety of a correspondingly large population. Accordingly, "the breadth and nature" of the allegedly negligent conduct is consistent with traditionally governmental functions (*Matter of World Trade Ctr. Bombing Litig.*, 17 NY3d at 450).

Furthermore, a finding that the negligence alleged here relates to a governmental function is consistent with the policy goals underlying the doctrine of governmental immunity. The doctrine seeks to foster the ability of entities performing governmental functions to make "decisions that involve the balancing of burdens and risks, competing interests, and allocation of resources" (*id.* at 454). These discretionary decisions, which are often made, as here, while the public at large

is facing an immediate threat from an emergency situation, "cannot be dictated by the edict of a court or the retrospective conclusions of a jury" (*id.* at 452).

The plaintiffs nevertheless contend that even if LIPA was entitled to governmental immunity, NGES could not assert such a defense since it was a private, for-profit corporation and not a governmental entity. This contention is without merit. The negligent acts and omissions attributed to NGES in the amended complaint relate to its performance of an essential governmental function for LIPA in responding to the crisis created by Hurricane Sandy. Accordingly, under the circumstances, NGES is not precluded from asserting the defense of governmental immunity by virtue of its status as a private contractor (*see Altro v Conrail*, 130 AD2d 612, 613 [1987]; *see also Filarsky v Delia*, 566 US —, 132 S Ct 1657 [2012]). The plaintiffs' remaining contentions, raised as alternative grounds for affirmance (*see Parochial Bus Sys. v Board of Educ. of City of N.Y.*, 60 NY2d 539, 545 [1983]), are also without merit.

In sum, the gravamen of the plaintiffs' case is that the moving defendants were negligent in preparing for, and responding to, a natural disaster. As such, the injury-causing acts or omissions alleged in the amended complaint pertain to governmental functions. The Supreme Court's determination to the contrary was error as a matter of law. Furthermore, the plaintiffs do not allege the existence of a special duty that could render the moving defendants liable for the performance of this governmental function. Construing the amended complaint liberally, accepting the facts alleged in it as true, and affording the plaintiffs the benefit of every possible favorable inference, as we are required to do, the plaintiffs' allegations fail to state a cause of action against the moving defendants. Accordingly, the Supreme Court should have granted the moving defendants' motion pursuant to CPLR 3211 (a) (7) to dismiss the amended complaint insofar as asserted against them.